577 So.2d 565 (1991)
Thomas PADGETT, Petitioner,
v.
DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, Respondent.
Mary Hartline PADGETT, Petitioner,
v.
DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, Respondent.
Nos. 74357, 74358.
Supreme Court of Florida.
March 28, 1991.
Lawrence J. Semento of Lawrence J. Semento, P.A., Mount Dora, for petitioner, Thomas Padgett.
Mark A. Nacke of Michael H. Hatfield P.A., Umatilla, for petitioner, Mary Hartline Padgett.
Linda K. Harris, Deputy Gen. Counsel, Dept. of Health and Rehabilitative Services, Tallahassee, for respondent.
SHAW, Chief Justice.
We have for review Padgett v. Department of Health & Rehabilitative Services, 543 So.2d 1317, 1318 (Fla. 5th DCA 1989), in which the district court certified the following: "[W]e... certify the question of "prospective" abuse, neglect or abandonment under Chapter 39 to be one of great public importance... ." We have jurisdiction. Art. V, § 3(b)(4), Fla. Const. Because we find the term "prospective" abuse, neglect or abandonment to be misleading and inapplicable to the present *566 cases,[1] we rephrase the question as follows:
WHETHER PRIOR TERMINATION OF A PARENT'S RIGHTS IN ONE CHILD CAN SUPPORT THE SEVERING OF THE PARENT'S RIGHTS IN ANOTHER CHILD.
We answer in the affirmative under conditions explained below. We approve the district court decision.
Two years before W.L.P. was born, five children born to Thomas Padgett during a previous marriage were committed to the Department of Health and Rehabilitative Services (HRS) for adoption based in part on the following findings involving four of the children:
5. Dr. Myron A. Harvey, Ph.D., a licensed clinical psychologist, evaluated [the four Padgett children] during July, 1981, and he has been involved in psychological therapy with those children up to the present date. Dr. Harvey testified that at the time of his evaluation, each of the four (4) Padgett children he examined manifested emotional and behavioral disorders, together with a low level of intelligence functioning.
6. Dr. Harvey further testified that in his opinion, the emotional disorders and low I.Q. of the Padgett children were the result of their living in a deprived environment devoid of learning stimuli and emotional contact. He further testified that the Padgett children have shown substantial improvements in both intelligence level and behavior since they began living in the structured environment of the Florida Baptist Children's Home.
... .
9. Thomas William Padgett, former husband of [the children's natural mother], testified that on approximately four (4) occasions during their marriage, the children's natural mother would leave the marital home and abandon the children with the father. During those absences which lasted several weeks, the mother would not visit with or otherwise contact the children. Thomas William Padgett further testified that on several occasions when he returned home from work he found some or all of his children bound at the wrists and tied to the furniture and their mother not being present.
The court concluded that the children were dependent due to the extreme neglect of Thomas as well as his wife. Dr. Harvey later testified in the instant proceeding that two of the children showed signs of sexual abuse.
The year before W.L.P. was born, Mary Padgett gave birth to a child that promptly was placed in HRS custody and was permanently committed for adoption on the following grounds:
3. The child has been in the custody of the Department of Health and Rehabilitative Services since June 1, 1984, shortly following her birth. She was taken into custody by the Department on or about that date after the Department was notified by hospital authorities that the mother was "poking" her newborn child and displaying other inappropriate conduct with the child.
4. Dr. Frank Carrera, a psychiatrist in Gainesville, Florida, performed a psychiatric evaluation on the mother on August 30, 1984, which included a detailed review of her prior psychiatric history. *567 Dr. Carrera testified that the child's mother is a chronic schizophrenic and he traced a history of numerous psychiatric hospitalizations of the mother for schizophrenia over the past several years.
5. Dr. Carrera further testified that the treatment prognosis for the mother was very poor and that, in his opinion, the mother would never be able to effectively parent her child.
On December 12, 1985, two days after W.L.P. was born, HRS filed a petition for detention of W.L.P. based on the fact that Mary Padgett 1) had recently given birth to a child who was placed in HRS custody, 2) was receiving mental health care, and 3) had tried to perform an abortion on herself with a pair of scissors to prevent the birth of W.L.P. The trial court entered a dependency detention order on the same day and subsequently placed W.L.P. in the care of the maternal grandmother. On September 27, 1986, the court issued an amended order of dependency, finding both parents unfit and placing the child in foster care. The parents and HRS signed a performance agreement, whereby HRS agreed that W.L.P. would be returned if the parents could demonstrate sufficient parenting ability after undergoing psychotherapy and attending parenting classes.
Dr. Hobey subsequently conducted a final evaluation of the Padgetts; she testified as follows:
Q. Dr. Hobey, based on all of your evaluations, your clinical interviews, your testing procedures and your observations of the parents with the child, were you able to formulate an opinion as to the Padgetts' fitness or ability to parent this child that you observed them with, []?
A. Yes, I had extremely grave concerns about the Padgetts' capacity to parent their child in any way resembling adequate fashion. I just don't think they're able to do that.
Q. What was the basis for that opinion, can you explain to the Court?
A. Yes, the basis for this is, I think that they are so  they have so few emotional and cognitive resources of their own, that's one thing. They are very much people who are into their own needs and their own wishes, and I think that they are incapable to recognize the needs and the desires and the abilities of a young child.
I think the things they do with their baby reflect their own needs, rather than being sensitive to the baby's needs.
I think that their expectations for children are absolutely unrealistic. They have absolutely no sense at all what kinds of behaviors are appropriate for a child. I think they are not capable of learning what these behaviors might be.
Q. Do your findings translate, in any way, into a risk of abuse or risk that they would be abusive parents of the child?
A. I think the risk is very high that they would be very abusive.
Q. With both Mary Padgett and Tom Padgett?
A. Yes, both Mary Padgett and Tom Padgett.
Q. What about either of them individually? Did your findings support that either of them individually could parent this child effectively?
A. No.
Q. Dr. Hobey, if you were attempting to prescribe a treatment program for these parents whereby they could overcome their pathologies and become effective parents, do you think you could do that?
A. I don't think I could do that, no.
Q. Why not?
A. I don't think that the Padgetts are really able to engage with a therapist. I don't think that they're sensitive to the fact that they have real problems. I don't think that they are at ali able to look at themselves, toward being insightful. In short, I don't think they are capable of learning what they need to learn. We're not talking about a few simple skills that could be acquired in a parenting class. We're talking about long-standing personality problems, which are not treatable.
*568 Dr. Hobey noted that her conclusions were unrelated to the Padgetts' intelligence levels;[2] in her opinion, persons of limited intelligence can be perfectly capable parents.
While the permanent commitment proceeding was pending in the instant cases, two separate incidents took place involving Mary. First, she staged a bizarre "fake rape," in which she abused herself with a hairbrush and then reported to officers that she had been bound and raped by a neighbor. Second, she sexually abused a four-year-old girl who was in her care. The policeman who responded to the call concerning the child testified that when he arrived at Mary's home, he found the girl lying on the bed on a bloody towel, bleeding from her vaginal area. The pediatrician who examined the child found that her internal genitalia had been lacerated and bruised by the penetration of a blunt object, such as a dull knife or a broomstick, with strong force. Mary pled guilty to aggravated child abuse and was placed on probation for five years. As a condition of her probation, she is prohibited from having contact with minor children unless another adult is present.
Based on evidence of the foregoing, the circuit court in the present proceeding issued a final order on August 16, 1988, permanently committing W.L.P. to HRS for adoption, finding as follows:
[] The Court finds that there is a substantial likelihood of future abuse and neglect of the child if [the child] were to be returned to the custody of [the] parents. The Court further finds that there are no less restrictive alternatives available other than the permanent commitment of the child to the Department for subsequent adoption, and that it is in the manifest best interest of the child that [the child] be permanently committed to the Department for subsequent adoption.
The district court affirmed but certified the question of whether prospective abuse, neglect or abandonment can serve as grounds for terminating parental rights.
The Padgetts assert that prospective mistreatment cannot support permanent termination of parental rights because no statute so provides. Mary contends that prospective abuse is based on speculation and is equivalent to jailing someone based on the belief that he "would have" committed a crime. Thomas claims that this is a social issue involving a fundamental liberty interest and must be left to the legislature. Courts, he says, simply cannot predict who will be a "bad" parent. Both Mary and Thomas claim that even if the concept of prospective abuse is valid, the evidence here is insufficient.
Initially, we decline to use the term "prospective" abuse or neglect to characterize the issue presented in the present cases. The mistreatment that was asserted by HRS as grounds for terminating the Padgetts' parental rights was actual, not prospective, and resulted in the permanent termination of their parental rights in other children: Mary was found to have been "poking" and displaying other inappropriate behavior toward a newborn and recently pled guilty to damaging the sexual organs of a four-year-old. Thomas was found to have seriously neglected five children and to have acquiesced in their severe abuse at the hands of his former wife. The real question posed here is whether this prior termination of parental rights in other children can serve as grounds for permanently severing the Padgetts' rights in the present child. To answer this question, we must determine first whether statutory or other authority exists to sustain such a practice, and second whether the practice violates constitutional principles.
General authority supporting the practice of terminating parental rights based on prior abuse or neglect of other children is found in the legislative intent underlying enactment of the Florida Juvenile Justice Act[3] (the Act). The legislature has provided that the Act is to be liberally construed to effect its stated purpose of guaranteeing *569 the child a safe and nurturing environment free from the prospect of abuse or neglect:
39.001 Short title, purposes, and intent. 
... .
(3) It is the intent of the Legislature that this chapter be liberally interpreted and construed in conformity with its declared purposes.
39.002 Legislative intent.  It is a goal of the Legislature that the children of this state be provided with the following protections:
(1) A permanent and stable home.
(2) A safe and nurturing environment which will preserve a sense of personal dignity and integrity.
(3) Adequate nutrition, shelter, and clothing.
... .
(5) Protection from abuse, neglect, and exploitation.
§§ 39.001, .002, Fla. Stat. (1987). The Act expressly authorizes the practice where prior attempts at rehabilitation have failed:
39.464 Elements of procedures for termination. 
... .
(2) EXTRAORDINARY PROCEDURES. 
(a) Whenever it appears that the manifest best interests of the child demand it, the state may petition for termination of parental rights without offering a performance agreement or permanent placement plan to the parents... .
(b) The state may petition under this subsection only under the following circumstances:
... .
2. Severe or continuous abuse or neglect of the child or other children by the parent that demonstrates that the parent's conduct threatens the life or well-being of the child regardless of the provision of services as evidenced by having had services provided through a previous performance agreement or permanent placement plan.
§ 39.464, Fla. Stat. (1987) (emphasis added).[4] We agree with the fourth district's straightforward conclusion that any other interpretation of legislative intent is untenable: "As the trial court pointedly observed in his final order, placing the boy with his mother will assure mistreatment. The Legislature clearly did not intend to have a child suffer such an experience before a trial court could act." In re J.L.P., 416 So.2d 1250, 1253 (Fla. 4th DCA 1982).
The practice also is supported by caselaw and strong public policy concerns. Florida district courts repeatedly have upheld the practice of terminating parental rights based on the prior abuse or neglect of other children.[5] The second district has *570 directly addressed the matter and concluded:
[W]e believe a parent's abuse of some of her children may constitute grounds for the permanent commitment of her other children who also live with the parent.... To continue to expose children to abuse by a parent simply because findings of prior abuse by the parent only concerned others of the parent's children would constitute an unacceptable risk to the children where, as here, the mother's propensities in that regard were shown to be beyond reasonable hope of modification.
In re W.D.N., 443 So.2d 493, 495 (Fla. 2d DCA 1984). The fifth district expressed society's fundamental aversion to the idea of requiring that a child suffer actual abuse or neglect before it can be permanently removed from a caretaker who has seriously mistreated others and is unrehabilitated:
The record in this case reflects D.L.P. is a difficult, troubled child, badly in need of therapy, and a safe, stable environment to be able to achieve normal adulthood. To require him to actually suffer sexual abuse before permitting the state to intervene would be absurd and especially cruel to this or any vulnerable child.
Palmer v. Department of Health & Rehabilitative Servs., 547 So.2d 981, 984 (Fla. 5th DCA), cause dismissed, 553 So.2d 1166 (Fla. 1989). In sum, to require a child to suffer abuse in those cases where mistreatment is virtually assured is illogical and directly averse to society's fundamental policy of preserving the welfare of its youth.
As to whether the practice violates constitutional principles, this Court and others have recognized a longstanding and fundamental liberty interest of parents in determining the care and upbringing of their children free from the heavy hand of government paternalism. The United States Supreme Court has concluded that "freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment." Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982). This interest is especially implicated in proceedings involving the termination of parental rights:
The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents... . Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for ... protections than do those resisting state intervention into ongoing family affairs.
Id. Florida courts have long recognized this fundamental parental right, as we noted in State ex rel. Sparks v. Reeves, 97 So.2d 18, 20 (Fla. 1957) (citation omitted): "[W]e nevertheless cannot lose sight of the basic proposition that a parent has a natural God-given legal right to enjoy the custody, fellowship and companionship of his offspring. This is a rule older than the common law itself... ."
In fact, "the only limitation on this rule of parental privilege is that as between the parent and the child the ultimate welfare of the child itself must be controlling." Id.
While Florida courts have recognized the "God-given right" of parents to the care, custody and companionship of their children, it has been held repeatedly that the right is not absolute but is subject to the overriding principle that it is the ultimate welfare or best interest of the child which must prevail.
In re Camm, 294 So.2d 318, 320 (Fla.), cert. denied, 419 U.S. 866, 95 S.Ct. 121, 42 L.Ed.2d 103 (1974). While the parent's interest in maintaining parental ties is essential, the child's entitlement to an environment free of physical and emotional violence at the hands of his or her most trusted caretaker is more so. The state has a compelling interest in protecting all its citizens  especially its youth  against the clear threat of abuse, neglect and death.
*571 To protect the rights of the parent and child, we conclude that before parental rights in a child can be permanently and involuntarily severed, the state must show by clear and convincing evidence that reunification with the parent poses a substantial risk of significant harm to the child.[6] Implicit in this standard is the basic requirement that, under ordinary circumstances, the state must show that the parent abused, neglected or abandoned a child.[7] The question before us today is whether this abuse, neglect or abandonment must concern the present child, or whether it can concern some other child. Based on our above analysis, we hold that the permanent termination of a parent's rights in one child under circumstances involving abuse or neglect[8] may serve as grounds for permanently severing the parent's rights in a different child.
We note that because parental rights constitute a fundamental liberty interest, the state must establish in each case that termination of those rights is the least restrictive means of protecting the child from serious harm. This means that HRS ordinarily must show that it has made a good faith effort to rehabilitate the parent and reunite the family, such as through a current performance agreement or other such plan for the present child. We additionally point out that factors related to a parent's lack of financial resources cannot support permanent termination of parental rights. Cf. ch. 90-306, § 19 at 2448, Laws of Fla. ("This failure to substantially comply is evidence of abuse, abandonment, or neglect, unless the court finds that the failure to comply with the performance agreement is due to the lack of financial resources of the parent... ."). As is apparent from the above analysis, a parent's intelligence level ordinarily is irrelevant to this inquiry.
While we are loath to sanction government interference in the sacrosanct parent-child relationship, we are more reluctant still to forsake the welfare of our youth. Florida's children are simply too important. We find that the record in the present cases contains sufficient competent evidence to support the trial court's order permanently terminating parental rights. We approve the district court decision.
It is so ordered.
OVERTON, McDONALD and GRIMES, JJ., concur.
BARKETT, J., concurs specially with an opinion, in which KOGAN, J., concurs.
BARKETT, Justice, specially concurring.
Although I agree with the majority, I write to emphasize that the evidence necessary to terminate parental rights is not simply the bare assertion of an expert that parents lack the "capacity to parent their child." Rather, the decision must be supported by factual evidence of actual physical, emotional, and/or sexual abuse.
Permanent severance of the parent-child relationship is a serious matter that involves constitutionally protected liberty interests. In re R.W., 495 So.2d 133 (Fla. 1986) (and cases cited therein); see also In re D.B., 385 So.2d 83 (Fla. 1980) (requiring indigent parents to be provided counsel in a permanent termination proceeding). The United States Supreme Court has stated:
The fundamental liberty interest of natural parents in the care, custody, and *572 management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life.
Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982). To ensure that the rights of both parent and child are fully protected, the reasons for the permanent termination of parental rights must go far beyond the fact that others may be more capable of caring for the child.[9] "A mother's parental rights in and to her child, and the child's corresponding rights in and to its mother, cannot be terminated by the State based solely upon the mother's deficient parental capabilities which result from conditions beyond her control." In re C.N.G., 531 So.2d 345, 347 (Fla. 5th DCA 1988) (Cowart, J., dissenting) (arguing that parental rights cannot be terminated merely because the parents are mentally and emotionally deficient); see In re T.D., 537 So.2d 173 (Fla. 1st DCA 1989) (court refused to permanently commit a child to foster care where HRS failed to provide clear and convincing evidence that the mother's lack of intellectual capacity and parenting skills translated into neglect, abuse, or abandonment).
Clearly, conclusions that parents manifest a low level of intelligence or lack emotional and cognitive resources by themselves would not be enough to terminate parental rights. Those characterizations undoubtedly describe thousands of individuals who are now, and will continue to be, loving parents. Such findings are a far cry from clear and convincing proof of abuse, neglect, or abandonment. See In re R.W., 495 So.2d at 135. As one judge recently observed:
While the best interests and welfare of the child is the sole guide in legal controversies relating to a child's custody, it has no proper place when the issue is the permanent termination of parental rights. The reason should be obvious. It is in the best interest and welfare of every child to have the best possible parents. Whatever criteria are used to measure the desirable characteristics of ideal parents, obviously one-half of all parents are superior to, and better than, the other half. Any rule of law permitting the government to permanently terminate natural parental rights based on the best interests of the child will justify the government in taking all children away from the less adequate half of all parents and giving them to the other, "better," half. Under such a rule of law the government need merely say: "Look, kid, we will find you some better parents."
C.N.G. 531 So.2d at 347 n. 10 (Cowart, J., dissenting). Thus,
notwithstanding the natural parent's inadequacy and a judicial belief that it may be in the best interest of the child to be adopted by more adequate parents, under Florida law, proof by clear and convincing evidence that a parent who is able to do otherwise has abused, neglected, or abandoned a child is essential to an involuntary termination of that parent's rights in and to that child.
Id. at 347.
I also stress that because parental rights are recognized as a fundamental liberty interest, the state must prove that termination of those rights is the least restrictive alternative. See Dunn v. Blumstein, 405 U.S. 330, 343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972). To meet this standard, HRS must, in the very least, make reasonable and meaningful efforts to reunite the family. Termination of parental rights should be the remedy of last resort, employed only when other reasonable alternatives have been exhausted.
KOGAN, J., concurs.
NOTES
[1] The term "prospective" simply means likely to happen. Although every termination case is prospective in the sense that it involves an element of speculation as to whether mistreatment will occur if the child is returned to the home, courts generally have reserved use of the term to characterize those termination cases where parental rights in a child are severed without evidence of abuse or neglect to that particular child. Parental rights are said to be terminated in such cases based on "prospective," as opposed to "actual," abuse of the child. We reject this analysis and point out that most such "prospective" abuse cases are in fact based on actual, documented mistreatment of other children and are no more speculative in nature than conventional termination cases involving prior abuse or neglect of the present, as opposed to some other child. See infra note 5. Such is the case in the present proceedings. To characterize these cases as "prospective," thus implying that they are somehow more speculative than conventional cases, is misleading. We are not presented today with a truly "prospective" abuse case in which the state seeks to terminate parental rights based solely on prospective abuse, i.e., without evidence of actual abuse to any child, and we do not decide this issue.
[2] Both Mary and Thomas are borderline retarded, with I.Q.s below 70.
[3] Ch. 39, Fla. Stat. (1987).
[4] Section 39.464 has since been amended to read:

39.464 Grounds for termination of parental rights.  The department, the guardian ad litem, or a licensed child-placing agency may petition for the termination of parental rights under any of the following circumstances:
... .
(3) SEVERE OR CONTINUING ABUSE OR NEGLECT.  The parent or parents have engaged in conduct towards the child or towards other children that demonstrates that the continuing involvement of the parent or parents in the parent-child relationship threatens the life or well-being of the child regardless of the provision of services. Provision of services is evidenced by having had services provided through a previous performance agreement, permanent placement plan, or offer of services in the nature of a case plan from a child welfare agency. A current performance agreement or permanent placement plan need not be offered to the parent or parents, and the petition may be filed at any time before a performance agreement or permanent placement plan has been accepted by the court.
Ch. 90-306, § 16, Laws of Fla.
[5] See, e.g., Lett v. Department of Health & Rehabilitative Servs., 547 So.2d 328 (Fla. 5th DCA 1989) (prior physical abuse of two siblings); Palmer v. Department of Health & Rehabilitative Servs., 547 So.2d 981 (Fla. 5th DCA) (prior sexual abuse of sibling), cause dismissed, 553 So.2d 1166 (Fla. 1989); In re Baby Boy A, 544 So.2d 1136 (Fla. 4th DCA 1989) (prior physical abuse of sibling); Padgett v. Department of Health & Rehabilitative Servs., 543 So.2d 1317 (Fla. 5th DCA 1989) (prior physical abuse and neglect of six other children); In re W.D.N., 443 So.2d 493 (Fla. 2d DCA 1984) (prior physical abuse of two siblings); In re J.L.P., 416 So.2d 1250 (Fla. 4th DCA 1982) (past history of alleged child abuse).
[6] The statutory prerequisites for termination of parental rights are contained in section 39.467(2), Florida Statutes (1987), which provides that under ordinary circumstances before parental rights can be involuntarily terminated the state must show by clear and convincing evidence that the present child was adjudicated dependent, a dependency disposition order was entered, the parent was informed of his or her right to counsel, and the parent failed to substantially comply with the terms of a performance agreement or permanent placement plan. Section 39.467(2) has been amended by section 19, chapter 90-306, Laws of Florida.
[7] See In re R.W., 495 So.2d 133, 135 (Fla. 1986) ("We conclude and hold that, before parental rights can be permanently terminated, the state must show abandonment, abuse, or neglect by clear and convincing evidence.").
[8] We decline to address the issue of abandonment because it is not presented in the present cases.
[9] In this case, not only was Mary adjudicated guilty of aggravated child abuse, but as a condition of her probation she is prohibited from having unsupervised contact with minor children. Thomas and Mary live together, and Thomas works during the day. Thus, as a practical matter, returning W.L.P. to Thomas and Mary is not a viable option.