687 So.2d 319 (1997)
S.Q., Mother of S.Q. a child, Appellant,
v.
The DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, Appellee.
No. 94-4100.
District Court of Appeal of Florida, First District.
January 31, 1997.
*320 Noel G. Lawrence, Jacksonville, for Appellant.
Robin Whipple-Hunter, Assistant District Legal Counsel, The Department of Health and Rehabilitative Services, Jacksonville, for Appellee.
JOANOS, Judge.
S.Q., the natural mother of a child adjudicated dependent, appeals an order terminating her parental rights to her son, S.Q., now age ten. The mother contends (1) the trial court failed to give adequate consideration to the applicable statutory factors, (2) the Department of Health and Rehabilitative Services (HRS) failed to present clear and convincing evidence that the mother was not in substantial compliance with the terms of the permanent placement plan, and (3) the trial court improperly terminated the mother's parental rights solely on the basis of the *321 mother's alleged non-compliance with the permanent placement plan.[1] We reverse and remand for further proceedings.
In January 1992, S.Q. was taken into custody and placed with a non-relative.[2] A dependency petition was filed, alleging that S.Q. was at risk of physical abuse by his mother, because the mother physically abused S.Q.'s sibling by striking her about the head and face and pulling her hair. In March 1992, both children were adjudicated dependent based upon the mother's stipulation. The whereabouts of S.Q.'s father was unknown. Under a disposition order filed in June 1992, the mother was ordered to obtain a psychiatric examination and follow through with all recommended mental health counseling or psychiatric treatment prior to any visitation with her children, to have a drug and alcohol evaluation and follow through with all recommended counseling, to enroll in and successfully complete parenting skills classes with at least an eighty-eight percent attendance, and to obtain and maintain stable employment and housing for a reasonable time. The order specified the mother was to have no contact with the children, including no telephone contact.
Under a permanent placement plan approved by the court, the mother was directed to perform numerous tasks, including: (1) submit to a psychological evaluation within six weeks with a psychologist approved by the Department; (2) sign a release of information with the evaluating psychologist; (3) initiate compliance with the recommendations of the psychological evaluation within two weeks of having the recommendations explained to her; (4) schedule an appointment for mental health counseling within two weeks of receipt of the agreement with a therapist approved by the Department; (5) abide by the treatment; (6) provide the Department with periodic reports of treatment progress, with reports to be furnished by either the mother or the therapist; (7) follow the recommendations of the therapist; (8) participate in family therapy when the therapist deemed appropriate; (9) schedule parenting classes within two weeks of receipt of the agreement; (10) successfully complete parenting classes and provide the Department with documentation of successful completion; (11) demonstrate appropriate parenting skills during visitation; (12) obtain and maintain stable living arrangements; (13) provide documentation of a stable residence through rent receipts and utility bills; (14) advise the HRS counselor of any other residents in the home; (15) apply to H.U.D., the local City Housing Authority, or other housing agencies within two weeks of receipt of the permanent placement plan; (16) obtain a verifiable source of income adequate to the child's needs, and document all sources of income; (17) be responsible for her own transportation to counseling appointments, visitation, and employment; and (18) maintain weekly contact with the HRS counselor by telephone, face-to-face visits, or by letter, and advise the counselor of a change of address within three days of the change.
The record contains documentation of the mother's employment and verifiable wages; documentation establishing that the mother underwent a diagnostic psychiatric interview on June 20, 1992; documentation that the mother successfully completed parenting classes conducted by the Children's Home Society with a perfect attendance record; and documentation from HRS that an abuse investigation of the mother had been closed without classification, i.e., the report was classified as "unfounded." In addition, the record contains letters and notices evincing the mother's continued efforts to find permanent employment, and letters from former neighbors of the mother stating the mother was a good tenant who kept her apartment clean and neat, and a good mother who monitored her children's activities. The record also contains a receipt issued by a CYF *322 counselor on December 22, 1992, acknowledging receipt of toys and other wrapped gifts purchased by the mother for her son. Since the mother was denied all contact with her child, she was forced to rely upon HRS to deliver the gifts.
A judicial review and case plan update filed January 8, 1993, indicated the mother was not allowed any visits with her child until a psychological evaluation was received recommending such visitation. The case plan update further stated the mother would not sign release forms for release of the psychological evaluation to HRS, the mother had displayed some emotional instability and was not willing to cooperate with HRS, and though the mother called the HRS office frequently to check on her son, she would not provide HRS with her telephone number or address.[3]
On September 15, 1993, the mother underwent a second psychiatric evaluation performed by Dr. Virzi. The report submitted by Dr. Virzi stated the mother was highly anxious and under an extreme amount of stress due to her desire to restore her relationships with her children. Dr. Virzi found the mother's attention span and concentration to be in normal range, and she appeared to be of normal intelligence. Although Dr. Virzi noted a strong paranoid theme, he concluded the paranoia could not be ascertained with any degree of certainty, in light of the trauma the mother experienced with the loss of her children. The doctor concluded there was nothing to indicate the mother had any severe psychiatric illness, but there were "soft signs" that she had some psychiatric problems which "need to be further elucidated." Dr. Virzi recommended that the mother enter into an observation process and day treatment under Kevin Lynch, psychologist, to determine the extent of her personality assets and weaknesses in regard to child rearing. The mother's clinical profile was within normal limits and no clinical diagnosis was provided.
In accordance with Dr. Virzi's recommendation, the mother was seen by Kevin Lynch, clinical supervisor at Gateway Treatment Center for Alcoholism/Chemical Dependency. Mr. Lynch's report established that the mother followed his recommendation that she undergo a psychiatric evaluation, and he found the mother was not dependent upon, and did not abuse, alcohol or other drugs.
In January 1994, the Department filed a petition for termination of parental rights. The petition alleged that despite provision of a performance agreement approved by the court, the mother was guilty of continuing abuse or neglect of the child.[4] During the pretrial proceedings, the mother advised the trial court she had tried to comply with every court order and believed she had done so, and she could not understand why she was not permitted to have custody of, or even visitation with, her children. The mother stated she had undergone three psychological evaluations, including one performed by a psychiatrist selected and paid by the mother.[5] When the trial court questioned the reason for denying the mother all visitation with her child, an HRS counselor explained the prior judge's order specified that the mother would not be allowed visitation until she released information to the referral party. The HRS counselor advised the successor judge that the mother signed a release, and was not responsible for the failure to release information. Rather, the evaluation team failed to provide the mother with the proper form. As a result of the evaluation team's conduct, information had not been released to HRS and other parties.
Thereafter, the mother underwent a courtordered evaluation by Dr. Miller, psychiatrist. Dr. Miller's report set forth a clinical impression of the mother's condition as "schizophrenic disorder, paranoid type." Dr. *323 Miller stated the mother's defenses were very rigid, but if she found she could surrender herself to treatment, "some improvement in her overall adjustment would probably follow." Based upon Dr. Miller's clinical impression, the trial court refused to permit unsupervised visitation, but apparently considered a grant of supervised visitation. An HRS representative opposed initiation of any visitation, on the ground that the Department was ready to proceed on termination of parental rights.
The termination proceeding took place in October 1994. Dr. Miller testified that schizophrenia disorder, paranoid type, is responsive to treatment. He opined that the mother was unable to provide sustained and consistent care of children at the time of his evaluation, describing her as "tenuously and precariously holding herself together." Dr. Miller explained that remissions occur in schizophrenia disorder, and visitation would be helpful rather than injurious to the children during a period of remission. He testified further that the mother has many positive features: she is intelligent, she was trying to do things to adapt, and she was working. According to Dr. Miller, a reasonable trial period to ascertain whether the mother was amenable to treatment would be a minimum of three months and a maximum of six months.
Dr. Albatrosov, the psychiatrist selected by the mother, also testified at the termination proceeding. Dr. Albatrosov diagnosed the mother's condition as psychothyia, a mild form of depressive illness. He said the condition is treatable by individual therapy. In Dr. Albatrosov's opinion, the mother does not need medication and does not need involuntary commitment for treatment.
At the conclusion of the termination hearing, the trial court observed that it was particularly difficult to make a determination in a case in which the court had not been the original judge and had not heard the prior hearings.[6] The court further noted that this was not "a clear cut case of a boy being at risk." Nevertheless, the court concluded this was a clear-cut case of a mother who was unwilling to comply with court orders. The order terminating parental rights includes findings that the mother had had adequate time within which to face up to and deal with her psychological disorder, but she had willfully refused to do so. The trial court further found that for two years, the mother resisted all psychological and psychiatric treatment and counseling, and was thereby guilty of abuse, neglect or abandonment of the child.
Natural parents have a fundamental liberty interest in the care, custody, and management of their children. Santosky v. Kramer, 455 U.S. 745, 754-754, 102 S.Ct. 1388, 1394-1395, 71 L.Ed.2d 599 (1982); In the Interest of R.W., 495 So.2d 133, 135 (Fla. 1986). Because parental rights are a fundamental interest, the state must establish that termination of those rights "is the least restrictive means of protecting the child from harm." Padgett v. Department of Health and Rehabilitative Services, 577 So.2d 565, 571 (Fla.1991).
Parental rights cannot be permanently terminated absent clear and convincing evidence of abuse, abandonment, or neglect. § 39.467, Fla.Stat. (1993); In the Interest of R.W., 495 So.2d at 135. "[T]he permanent termination of a parent's rights in one child under circumstances involving abuse or neglect may serve as grounds for permanently severing the parent's rights in a different child." Padgett, 577 So.2d at 571.
In a termination of parental rights proceeding, the statutory scheme directs that the trial court "shall consider and evaluate all relevant factors, including, but not limited to..." the eleven factors set forth in section 39.467(2)(a)-(k), Florida Statutes (1993). When a petition to terminate parental rights is predicated upon allegations of abuse, neglect, or abandonment, a performance agreement or permanent placement plan must be offered. In the Interest of T.M., 641 So.2d 410, 412 (Fla.1994). Once offered, a parent's failure to "substantially comply" with the *324 agreement or plan "is evidence of abuse, abandonment, or neglect...." § 39.467(3)(e), Fla.Stat. (1993). Despite the statutory presumption, "[f]ailure to comply with a performance agreement's provisions ... cannot be the sole basis for permanently terminating a parent's fundamental right to the custody of his or her child or children." In the Interest of R.W., 495 So.2d at 135. See also In Interest of B.L.B., 635 So.2d 44 (Fla. 1st DCA 1994); In the Interest of D.J.S., 563 So.2d 655 (Fla. 1st DCA 1990). The general rule governing permanent termination is that parental rights ought not be terminated "solely on the basis of a temporary deficiency which results from conditions beyond the parents' control." In the Interest of T.D., 537 So.2d 173, 175 (Fla. 1st DCA 1989). See also Hroncich v. Department of Health and Rehabilitative Services, 667 So.2d 804 (Fla. 5th DCA 1996).
Any decision to terminate parental rights must be based on a finding that the following elements have been proved by clear and convincing evidence: (1) the child was adjudicated dependent; (2) a disposition order previously was entered; (3) the parent was informed of his or her right to counsel; (4) a performance agreement or permanent placement plan was offered to the parent; and (5) the parent failed to substantially comply with the plan. § 39.467(3), Fla.Stat. (1993); In the Interest of R.J., 586 So.2d 496, 498 (Fla. 1st DCA 1991); In the Interest of R., Children, 591 So.2d 1130, 1133 (Fla. 4th DCA 1992).
In Hroncich, on facts similar to the situation in this case, the Fifth District Court of Appeal reversed a termination of a mother's parental rights based upon a determination of prospective risk of neglect. The Hroncich record contained expert testimony describing the characteristics of schizophrenia, paranoid type. The examining expert in Hroncich concluded the parent needed a treatment situation which provided "some support and help and stability," as a prerequisite to the parent's ability to comply with the other tasks set forth in the performance agreement. Between the time that Hroncich's child was placed in foster care and the hearing to terminate parental rights, the case had been assigned to five successive case workers. The last counselor had an undergraduate degree in psychology, and was the only counselor with experience or knowledge in dealing with people with schizophrenia. Under the latest counselor's guidance, Hroncich made great advances. By the time of the final hearing, she had completed the tasks set by HRS. The attorney for HRS asserted that Hroncich's compliance was "too little too late." 667 So.2d at 806-807. The trial judge ruled that HRS had proved by clear and convincing evidence that Hroncich neglected her child based on the original reports, and that termination of parental rights was the least restrictive means to protect the child from prospective neglect. The appellate court disagreed, and reversed.
In the instant case, the trial court found the mother guilty of neglect and abandonment for six months or more, seemingly based upon the court's determination that she failed to substantially comply with any of the terms of the permanent placement plan, other than completion of parenting skills classes. The tasks set forth in the permanent placement plan prepared by the Department and accepted by the trial court were premised upon the incorrect assumption that a psychological evaluation of the mother would result in a recommendation for mental health treatment and counseling. In fact, the record reflects that there were no recommendations for mental health treatment of the mother until Dr. Miller made such recommendation during his testimony at the final hearing. The mother complied with Dr. Virzi's suggestion that she enter into observation and day treatment under Kevin Lynch. The record further reflects that Mr. Lynch found no evidence that the mother abused or was dependent upon alcohol or other drugs. Significantly, the mother complied with Mr. Lynch's recommendation that she undergo a psychiatric evaluation.
The trial court's findings regarding the mother's noncompliance with the permanent placement plan turn upon the mother's refusal to accept that she had a mental health problem. The court then found the mother refused to accept the services that may have been offered by a therapist, and in *325 so doing, she failed to demonstrate appropriate parenting skills. In our view, it is inappropriate to base a termination of parental rights on a finding that a parent refused services "that may have been offered," when, in fact, the services were not offered.
The record indicates the mother provided documentation of stable employment and a verifiable source of income. The record also indicates that the psychiatric and psychological evaluations of the mother did not include recommendations for treatment. Dr. Albatrosov's testimony that the mother believed she does not suffer any mental illness should be considered together with his clinical impressions that the mother suffered depression and trauma due to the loss of her children.
The order at issue in this case includes most of the findings required under section 39.467(3). However, the trial court did not find the factors were proven by clear and convincing evidence. As in Hroncich, the basic complaint in this case was that the mother's substantial compliance with the plan was not timely. The evidence indicates the mother's initial non-compliance was due to her mental condition and the failure of HRS caseworkers to understand the special patience, understanding, and nurturing required when dealing with a schizophrenic individual.[7] The record demonstrates that the mother was suspicious and distrustful of the HRS caseworkers. It is reasonable to infer that this suspicion and mistrust impaired the mother's ability to comply fully with the requirements of the permanent placement plan. Sadly, this mother did not have the good fortune to be assigned a caseworker with knowledge and experience in dealing with people who suffer from schizophrenia. See Hroncich.
The trial court in this case recognized the Department mishandled its efforts to arrange visitation between S.Q. and his sister, and expressed concern at the dearth of evidence to justify termination of the mother's parental rights. We agree with the trial court that the evidence in this case fails to establish prospective abuse or neglect by clear and convincing evidence. Rather, the testimony of the examining psychiatrists and psychologist indicated that with proper guidance and counseling, it is extremely likely the mother will be able to maintain a normal, functional relationship with her son. On this record, it does not appear that termination of parental rights was warranted, or that it is the least restrictive means of protecting the child from harm.
Accordingly, the order terminating parental rights is reversed, and the cause is remanded for further proceedings. Such further proceedings may include, but are not limited to, affording the mother a reasonable period of time to submit herself to the treatment regimen recommended by Dr. Miller at the final hearing. In this regard, the trial court may wish to caution the mother as to the gravity of the situation should she fail to cooperate with the recommended treatment. In the event the mother elects to undergo treatment, termination proceedings should not be reinstated for a reasonable period of time, to allow for completion of the mother's treatment program. If the Department again moves to terminate the mother's parental rights, the trial court must consider all of the statutory factors with reference to the mother's prognosis after treatment, in making the termination of parental rights determination.
WOLF and PADOVANO, JJ., concur.
NOTES
[1] The mother also asserted that the ruling terminating her parental rights constituted a violation of the Americans With Disabilities Act (ADA). 42 U.S.C. § 12131(2). The ADA question was raised in the mother's motion for rehearing. The trial court properly refused to consider the motion for rehearing, because it was filed after the notice of appeal was filed, and challenged the ruling under attack in the appeal. See Nguyen v. State, 655 So.2d 1249 (Fla. 1st DCA 1995). We decline to address the matter for the first time on appeal.
[2] S.Q. and his older half-sister were placed in the custody of the half-sister's paternal grandmother.
[3] We note that although HRS records state that child support was not ordered, the trial court later considered the mother's failure to pay child support as a factor in the determination to terminate parental rights.
[4] The mother was not permitted any contact with her child. Therefore, it appears the mother's alleged continuing abuse or neglect was based upon the mother's purported failure to obtain psychiatric treatment or counseling.
[5] The mother explained that she wanted to have an unbiased report.
[6] Due to the death of the original court reporter and the loss of her notes, there was no record of the prior hearings.
[7] Three or four different caseworkers were assigned to the mother's case. The updates submitted at 6-month intervals seemingly constitute a repeat of the findings in the previous update.