IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

DEPARTMENT OF CHILDREN AND FAMILIES,

      Appellant,

 v.

Case No.  5D22-1506
LT Case No. 2021-DP-060

S.S.L. AND M.D., PARENTS OF O.D., A CHILD,

      Appellees.

_____/

Opinion filed December 8, 2022

Appeal from the Circuit Court
for Osceola County,
Daniel Dawson, Judge.

Kelley Schaeffer, of Children's Legal
Services, Bradenton, for Appellant,
Department of Children and Families.

Sara Elizabeth Goldfarb, Statewide Director
of Appeals, and Desiree Erin Fernandez,
Senior Attorney, Statewide Guardian ad
Litem Office, Tallahassee for Guardian ad
Litem.

Scott L. Robbins, of Busciglio Sheridan
Schoeb, P.A., Tampa, for Appellee, S.S.L.

No Appearance for Other Appellee.

TRAVER, J.

The Department of Children and Families ("DCF") appeals the trial court's amended final judgment denying its petition to terminate the parental rights of S.S.L. ("Mother") and M.D. ("Father") over their child, O.D., a three-year-old boy. We reverse.

I.    Overview and Standard of Review

Parents have a fundamental liberty interest in the care, custody, and companionship of their children. *See Padgett v. Dep't of HRS*, 577 So. 2d 565, 570 (Fla. 1991). A child's ultimate welfare is the only limitation on this interest. *Id.* (quoting *State ex rel. Sparks v. Reeves*, 97 So. 2d 18, 20 (Fla. 1957)).

To prevail in its petition for termination of parental rights, DCF must prove three elements by clear and convincing evidence. *See* § 39.809(1), Fla. Stat. (2021); *E.K. v. Dep't of Child. & Fams.*, 326 So. 3d 149, 151–52 (Fla. 1st DCA 2021). Two are statutory: (1) a ground for termination; and (2) "the child's manifest best interests would be served by granting the petition to terminate parental rights." *See* §§ 39.806(1), 39.810, Fla. Stat. (2021). The Florida Supreme Court requires the third: termination must be "the least restrictive means of protecting the child from serious harm." *See Padgett*, 577 So. 2d at 571.

2

We employ a "highly deferential" standard of review. *See Statewide Guardian Ad Litem Program v. A.A.*, 171 So. 3d 174, 177 (Fla. 5th DCA 2015). This means that we will not reweigh the evidence the trial court heard, and we examine whether competent, substantial evidence supports the trial court's amended final judgment. *See Dep't of Child. & Fams. v. K.W.*, 277 So. 3d 708, 710 (Fla. 1st DCA 2019). We are not, however, required to defer to the trial court "where there is no theory or principle of law that would support the trial court's conclusions of law." *See Dep't of Child. & Fams. v. D.E.*, 325 So. 3d 277, 279 (Fla. 5th DCA 2021) (quoting *A.A.*, 171 So. 3d at 177). Indeed, our deference to the trial court on factual matters does not extend to its legal conclusions, which we review de novo. *See A.A.*, 171 So. 3d at 177.

O.D. is the older brother of N.E.D., his infant sister. The trial court terminated Mother's and Father's parental rights as to N.E.D. because of their egregious conduct towards her. The trial court correctly found that this conduct towards N.E.D. provided a statutory ground for termination as to O.D. *See* § 39.806(1)(f). But it improperly concluded that termination was not in O.D.'s manifest best interests, and that DCF had not proven that termination was the least restrictive means of protecting O.D. from future harm. Instead, the trial court placed O.D. in a permanent guardianship with

3

Father's parents, rather than terminating Mother's and Father's parental rights and ordering O.D.'s adoption. The law does not support either conclusion.

II.    Background

N.E.D. was ten weeks old when Mother brought her to the emergency room with what Mother described as "extreme hiccups." N.E.D.'s pediatrician had seen N.E.D. four weeks earlier and noted nothing amiss. Her hospital examination, however, revealed life-threatening injuries. She had at least eight total fractures in her rib cage in various stages of healing, which suggested she had been injured on multiple occasions. She had "corner" fractures in each leg and "buckle" fractures in each arm. Her spine showed signs of forcible compression. Her "extreme hiccups" were, in fact, seizures caused by three different brain injuries: two acute bleeds on each side of the front of her head, and one older hemorrhage where blood had pooled in the back of her head. She was also bleeding in both her eyes. Because of the injuries to N.E.D., O.D., then two years old, also received a medical examination, which revealed no injuries to him.

Following a shelter hearing, DCF placed O.D. with Father's parents. After her discharge from the hospital ten weeks later, N.E.D. joined him. DCF did not offer Mother or Father a case plan or any services for purposes of

reunifying them with N.E.D. and O.D.  With DCF supervision, Mother and Father visited both children.  Mother's and Father's behavior during these visits was appropriate, and the supervisor noted a bond between the parents and their children.  Mother and Father also provided Father's parents with money, supplies, and toys for N.E.D.'s and O.D.'s care.

DCF sought expedited termination of Mother's and Father's parental rights as to both N.E.D. and O.D.  In support, they relied on one statutory ground for termination.  Section 39.806(1)(f) provides that termination of parental rights may be established if the parents engaged in "egregious conduct that threatens the life, safety, or physical, mental, or emotional health of the child or the child's sibling."  "Egregious conduct," in this case, means "abuse . . . or any other conduct that is deplorable, flagrant, or outrageous by a normal standard of conduct."  *See* § 39.806(1)(f)2.  No nexus between egregious conduct to one child and potential harm to her sibling is required.  *See* § 39.806(1)(f).

The matter proceeded to trial.  Dr. Flavia Walter, a child abuse pediatrician, explained N.E.D.'s injuries to the trial court and opined on their potential causes and ages.  She testified that N.E.D.'s rib fractures were ten to fourteen days old, showed signs of healing, and could have been caused by compression or something heavy falling on her.  She said the "corner"

5

fractures in N.E.D.'s legs, characterized by chips at the ends of the bones, could have been caused by someone twisting and pulling N.E.D.'s legs, or from flopping around when someone shook her. Dr. Walter expressed confusion at the cause of N.E.D.'s broken arms. These "buckle" fractures are typically caused when adults or older children brace themselves when falling with an outstretched hand. She had never seen anything that could cause this type of injury in an infant. Unlike her ribs, N.E.D.'s arm and leg fractures evidenced no signs of healing and illustrated more recent injuries.

Dr. Walter stated that N.E.D.'s spine was compressed, meaning that the areas between her vertebrae had different heights. This typically happens when someone is shaken, forcibly slammed on their buttocks, or falls from a great height. She opined that the brain bleeds on each side of N.E.D.'s head were between one and three days old. These injuries could have been caused by a fall, car accident, or shaking. The brain bleed on the back of N.E.D.'s head was three to fourteen days old, and Dr. Walter testified that the potential causes were similar.

Father and Mother offered no plausible explanation for any of N.E.D.'s injuries or the different time frames during which they had occurred. Mother said she had no idea how the injuries had happened. Father said that he tripped and fell that morning while standing up from the couch with N.E.D. in

his arms. He testified to absorbing the impact with his arm and shoulder. Mother and Father both testified that they were her only caregivers, and that nobody else could have injured N.E.D. Further, N.E.D. had not fallen from a significant height, she was not involved in a car accident, and nothing heavy fell on her. She had no history of seizures or any medical conditions that made her bones brittle. She suffered no further injuries in the eleven months between her hospitalization and trial.

O.D. and N.E.D.'s guardian ad litem ("GAL") opined that the children could not be safely returned to Mother and Father's care because of the risk of future abuse. She noted that both children were very young and unable to protect themselves. She recommended termination of both Mother's and Father's parental rights, explaining that her position was grounded in the egregious abuse that occurred before the children were removed from their home. Accordingly, the parents' conduct following removal was irrelevant to her. She testified that "regardless of whether [Mother and Father were] appropriate during a one-to-two-hour [supervised] visit, the concern remains that there were some life-threatening injuries that were caused to the child."

By contrast, the children's paternal grandmother repeatedly insisted that the children "need their parents," and that reunification was appropriate. The children's paternal grandparents did not believe that Mother or Father

7

could have abused N.E.D., which appears to have concerned the trial court and motivated its ultimate decision.

The trial court denied DCF's petition as to O.D. It found that Mother's and Father's egregious conduct towards N.E.D. was a ground supporting termination as to O.D. It reasoned that either Mother caused N.E.D.'s injuries, Father caused N.E.D.'s injuries, or they both did. It concluded that there was no reasonable explanation for the life-threatening harm other than an intentional act.[1] It found, however, that "long term removal from the parents' custody"—not termination—was the least restrictive means of protecting O.D. from harm. Finally, it concluded termination was not in O.D.'s manifest best interests. In support of this conclusion, the trial court made eleven factual findings, corresponding to the eleven subsections of the manifest best interests statute. *See* § 39.810. It further opined that if it terminated Mother's and Father's parental rights, O.D. would likely be adopted by his grandparents with no DCF supervision. It reasoned that a

---

[1] Mother and Father separately appealed the termination of N.E.D.'s parental rights, each challenging the trial court's findings on egregious conduct. We affirmed the trial court's decision without written opinion. In this appeal, Mother does not challenge the trial court's ample and sufficient findings related to egregious conduct in her answer brief. Father has not participated in this appeal. Citing O.D.'s best interests, the GAL declined to file an answer brief.

permanent guardianship, which would necessarily require long-term DCF supervision, was "a safer option."

III.    Analysis

The trial court legally erred when it concluded that termination was not in O.D.'s manifest best interests, and that a permanent guardianship was the least restrictive means of protecting O.D. from harm.

A.    *Manifest Best Interests*

O.D.'s manifest best interests were served by termination of Mother's and Father's parental rights. The Florida Legislature directs trial courts to consider "all relevant factors" in making a manifest best interests determination, including eleven codified by statute. *See* § 39.810(1)–(11). This decision focuses on a child's best interests. *See In re Z.C.(1)*, 132 So. 3d 877, 879 (Fla. 2d DCA 2014).

The trial court made findings on all eleven statutory factors; as such, we review the trial court's overall legal conclusion de novo, while evaluating the trial court's findings on each factor for competent, substantial evidence. *D.E.*, 325 So. 3d at 279. One was neutral: the trial court recognized O.D. had no known mental or physical needs at this time. *See* § 39.810(4). Eight favored termination. The trial court noted the parents could not provide for O.D.'s health or safety until he was old enough to defend himself or explain

9

his potential injuries. *See id.* § 39.810(3). Relatedly, he also could not express his preferences and wishes to the trial court. *See id.* § 39.810(10). While this factor is often neutral in other factual contexts, given the egregious conduct against N.E.D., O.D.'s inability to express himself heightens the danger here. Further, the trial court found O.D. had been stably placed with his grandparents—who were willing to adopt him and with whom he had a strong bond—for over a year. *See id.* § 39.810(1), (6), (8), (9). Critically, the trial court reasoned that O.D. would "enter a more stable, permanent family relationship after termination of parental rights," a finding at stark odds with its ultimate conclusion. *See id.* § 39.810(7). The GAL recommended termination. *See id.* § 39.810(11). Competent, substantial evidence supports the trial court's findings on these nine factors.

Of the remaining two factors, the trial court erroneously analyzed one. The manifest best interests statute requires consideration of "[t]he love, affection, and other emotional ties existing between the child and the child's parent or parents, siblings, and other relatives, and the degree of harm to the child *that would arise from the termination of parental rights and duties.*" *Id.* § 39.810(5) (emphasis added). Here, the trial court acknowledged that love and affection existed between O.D. and his parents but noted that "due to the child's age and placement with relatives, it is unlikely the child would

10

be harmed by *a permanent placement with relatives.*  It is likely the parents would continue to have contact with the child even if their rights were terminated." (Emphasis added).  This finding is legally erroneous because the trial court considered whether O.D. would be harmed by a permanent placement with relatives, while the statute requires an analysis as to whether O.D. would be harmed by termination of parental rights.

In the remaining factor, the trial court determined that both parents had been providing for O.D.'s material needs.  *See id.* § 39.810(2).  While the record supports this conclusion, it is insufficient—standing alone—to support the trial court's manifest best interests decision*.  See D.E.,* 325 So. 3d at 280 ("While this analysis is not a matter of simple mathematics, we cannot find any support in the record or applicable law for the trial court's conclusion that continuing rather than terminating [Mother's and Father's] parental rights is in the child's manifest best interests.").  If O.D. cannot safely be returned to his parents for the long-term and foreseeable future, their ability to pay for day care and toys cannot be dispositive.  Accordingly, the trial court erred when it found termination was not in O.D.'s best interests.

B.    *Least Restrictive Means*

DCF established that termination was the least restrictive means of protecting O.D. from harm after it proved the parents' egregious conduct by

11

clear and convincing evidence. It was legal error for the trial court to conclude otherwise.

To establish that termination is the least restrictive means of protecting a child from future harm, DCF must "ordinarily" show that it made a good-faith effort to rehabilitate the parents and reunite the family. *See Padgett*, 577 So. 2d at 571. Generally, the provision of a case plan and services will satisfy this element. *See S.M. v. Fla. Dep't of Child. & Fams.*, 202 So. 3d 769, 778 (Fla. 2016). When a child or his sibling has been egregiously abused, however, "reasonable efforts to preserve and reunify families are not required." § 39.806(2); *see also In re T.M.*, 641 So. 2d 410, 413 (Fla. 1994).

Here, the trial court erred by applying the least restrictive means test after it had found Mother and Father had engaged in the egregious conduct prohibited by section 39.806(1)(f). Stated differently, once it found this statutory ground, termination was the least restrictive means of protecting O.D. *See In re T.M.*, 641 So. 2d at 413; *E.K.*, 326 So. 3d at 153; *V.S. v. Dep't of Child. & Fams.*, 322 So. 3d 1153, 1163 (Fla. 4th DCA 2021).

IV. Conclusion

Although we do not question the trial court's good intentions in placing O.D. in a permanent guardianship with his paternal grandparents, neither the

law nor the record supports its decision. Based on this record of truly egregious conduct, reunification is unsupportable. And the law compels adoption over permanent guardianship. *See* § 39.6221(1), Fla. Stat. (2021) (stating that trial court should not consider permanent guardianship unless it first "determines that reunification or adoption is not in the best interest of the child"). For these reasons, we reverse and remand for an entry of a second amended final judgment that terminates Mother's and Father's parental rights as to O.D. and orders O.D.'s eventual adoption. We express no opinion on his adoptive placement.

REVERSED and REMANDED with INSTRUCTIONS.

WOZNIAK, J., concurs.
NARDELLA, J., concurs in result only, without opinion.

13