824 So.2d 1000 (2002)
DEPARTMENT OF CHILDREN AND FAMILIES Appellant/Cross-Appellee,
v.
B.B. and T.B., as parents of E.B., S.B., etc. Appellees/Cross-Appellants.
Nos. 5D01-2606, 5D01-2697.
District Court of Appeal of Florida, Fifth District.
August 30, 2002.
*1001 Ralph J. McMurphy and David N. Silverstein, Wildwood, for Appellant/Cross-Appellee.
Scott Timothy Smith, Brooksville, for Appellee/Cross-Appellant, B.B.
Robert Allen Morris, Jr., of Law Offices of Robert Allen Morris, Jr., P.A., Spring Hill, for Appellee/Cross-Appellant, T.B.
GRIFFIN, J.
The Department of Children and Families ["DCF"] appeals an order terminating the parental rights of B.B. and T.B. to one of their children, but refusing to terminate parental rights to their remaining children. B.B. and T.B. have cross-appealed the termination of their parental rights to A.B.
B.B. is a former Mormon who practices polygamy. He married his first wife, T.B., in 1981. They have a total of eight children, seven of whom are involved in this appeal.[1] B.B. "married" his second wife, T.M., in 1987. They have one son. In addition, T.M. had custody of her two children from a prior marriage.
All of the children remaining in the household were taken into custody in March 2000, after T.M. and her fifteen-year old daughter, S.K., reported to police that, with T.B.'s blessing, B.B. had "married" his twelve-year-old natural daughter, A.B., as well as his fifteen-year-old stepdaughter, S.K. T.M. also told them that her husband was having sex on a regular basis with A.B. A dependency petition was initially filed, but DCF later decided to proceed straight to termination of B.B.'s and T.B.'s parental rights on the basis that B.B. and T.B. had engaged in conduct that demonstrates that their continuing involvement in the parent-child relationship threatens the life, safety, well-being, or physical, mental, or emotional health of their children, irrespective of the provision of services, see § 39.806(1)(c), Fla. Stat. (1999), and/or that they had engaged in egregious conduct or failed to prevent egregious conduct that threatens the life, *1002 safety, or physical, mental, or emotional health of the children or their sibling(s). See § 39.806(1)(f), Fla. Stat. (1999).
At the hearing on the petition, evidence presented by the Department revealed that from 1987 until March 2000, T.B. and T.M. shared B.B. as a husband, sometimes living in the same household with all of their children. B.B. divorced T.B. in 1991 and married T.M., but continued to live primarily with T.B. However, as of August 4, 1997, all three adults were living in the same household with all of their children. Also living with the family was Kevin Barr, a mentally disabled adult who moved in with the family in 1994. His earnings as a dishwasher were a primary source of income for the family.
At one time, the family was affiliated with the Mormon church, but the adults were excommunicated in 1991 due to their practice of polygamy. B.B. became the head of their own sect. He called himself the divine or divinic prophet and said that he one day would be the head of the Mormon Church. He got this information in one of his frequent revelations. He taught the children polygamy as a way of life, and he and some of the children communicated with the family of Tom Green, a well-known convicted child polygamist from Utah. It was "common knowledge" among the members of the household that B.B. spent some nights with T.B. and some nights with T.M. B.B. sometimes talked about his "mission," which was to multiply the earth with holy people. Apparently to help fulfill the mission, B.B. had plans to have many wives. T.M. testified that he had been on the Internet looking for additional wives shortly before the children were taken.
B.B. and A.B. denied a marriage between them had taken place, but T.M. and S.K. presented substantial testimony. T.M. testified that in 1998, B.B. had a "revelation" that he was to include his eleven-year-old daughter, A.B., among his wives. He originally said he was supposed to marry her when she turned fourteen, but later changed it to twelve. He told A.B. that she was to have twins by him. T.M. said that on A.B.'s twelfth birthday (which occurred in August 1999), they held a wedding ceremony and the marriage was consummated that night. A.B.'s mother, T.B., thought it was an honor that A.B. was being given the opportunity to marry her father because he was the divine prophet. She helped A.B. prepare for the wedding. In addition, T.M. overheard the mother and father talking about giving A.B. some marijuana to loosen her up for sex with her father. B.B. and his daughter stayed in the bedroom and bathroom for about an hour and then A.B. returned to her bed. A.B. told T.M. the following day that she had been in pain during intercourse and that her father had hurt her. She said he continued until he fully penetrated her and that she was still bleeding. After being with her father several times, A.B. complained of vaginal infections and continuing pain. B.B. later told T.M. that sex with A.B. was a boring experience, since A.B. was young and did not know how to please a man, like his other wives did. He also said he could not have a good sexual relationship with someone who could not have an orgasm and at one point he said he was almost repulsed whenever A.B. did become aroused. During A.B.'s fertile times, B.B. refrained from having sex with his other wives, so he could get A.B. pregnant. Usually the wives each got two nights a week, in part because T.B. said that A.B. was entitled to her fair share of time with her "husband."
T.M. and S.K. testified that in 1998, B.B. got a revelation that he was to marry his stepdaughter, S.K. S.K. was twelve or thirteen years old when she was told about *1003 the revelation. B.B. said, "I have to tell you that the Lord wants me to marry you and I'm supposed to have two kids by you." In the next few months, B.B. pressured S.K. to marry him. Due in part to the pressure, S.K. tried to commit suicide in October 1998. She was confined to her room upon her release from the hospital for several weeks. However, she and her stepfather ultimately got "married" in her mother's room in October or November 1999, in a ceremony attended by T.M., B.B., T.B., A.B. and the bride. Despite the marriage, S.K. refused to sleep with B.B. after the ceremony, even though he told her she would be punished. He also told her after the marriage that they needed to move in steps. One week they would hold hands, and the next week they hugged. After that, they lay in bed together, but S.K. refused any further intimacy. When she refused to consummate the marriage, B.B. told her she was going to get leprosy, and she would be crippled, deaf and blind.
Penetration of A.B. was confirmed by a doctor from the Child Protection Team. In addition, the eldest son admitted that he saw his sister and his father go off in a room to have sex. S.K. also testified that she saw A.B.'s journal, which was never found, and that it referred to her sexual relationship with her father. Additionally, A.B.'s sister testified that while she was in foster care A.B. told her about her marriage to her father.
A.B. denied ever having sex with her father. However, she admitted that she had told Detective Scarpati during their second conversation that she had married her father when she turned twelve. She also told him that they had consummated the marriage so she could have her father's children. While at the station, she went into a room alone with S.K. where they talked. The conversation was recorded and transcribed. A.B. indicated during that conversation that she had married her father, but that she intended to lie and say that she had had sex with a neighbor boy. A.B. attempted to explain all these statements during her testimony, but her explanation was illogical. Essentially, she claimed she told police she had sex with her father so that her parents would not know she actually had sex with a boy in the neighborhood. She claimed her accusations against her father were somehow going to prevent her father from being angry with her about the sex and that she later planned to withdraw them.[2]
Not surprisingly, the family led a relatively isolated existence. In recent years, all of the children were home-schooled, although the schooling was sporadic. They sometimes skipped three or four months, particularly around the time of Y2K, when they were preparing to move to a cave in the mountains of Tennessee. Some of the children were behind in their education by as much as three or four years when they were removed from the home.
The children rarely went to the doctor and instead received treatment from B.B., who claimed to have received medical training in the military. However, B.B.'s medical treatment was poor. He gave the children injections of alcohol to get rid of worms, which one doctor termed a low level of child abuse. His stitching of the children's cuts and injuries resulted in excessive scarring. A doctor from the Child Protection Team also observed that many *1004 of the children's injuries were treated without sutures, which he characterized as a low level of medical neglect. The evidence suggested that he may have given the children veterinary antibiotics.
There is no doubt, based on the evidence, that the family was dysfunctional. B.B. frequently said he was possessed by Satan. He engaged in self-flagellation. One time in 1990, he hit his face with his fists for an hour until it was so swollen his features were indiscernible. In 2000, after a "vision" that his family would be destroyed, he smashed his forehead with a log until it bled and became swollen. Everybody, including the children, had to hold him down. B.B. also had revelations concerning the children and told them they were under attack by Satan. He said that A.B. was to go blind; S.K. was to get leprosy; and A.B. was to lose her hair. Some of the children began to have nightmares.
T.M. also said she was possessed by Satan and during these incidents acted hysterical, screaming, hollering and saying strange things. One of the children testified she punched holes in the walls on occasion. Another testified she acted as if she was "insane." Yet another testified that once a month she would yell and scream that she was possessed by Satan and cry in her room for several days. This behavior was one of the reasons the eldest son, A.B., left the house. Barr testified that T.M. once asked him to perform an exorcism on her because Satan was possessing her. She also hit herself, claimed that in pre-existence she had sex with Satan, and told Barr she had revelations and heard voices in her head. T.B. thought T.M. was "nuts." B.B. testified that their whole family ultimately evolved into one centered around T.M.'s psychoses. On at least one occasion, shortly after the birth of her son in 1990, T.M. attempted suicide by cutting her wrists with a knife. She was Baker-Acted again in February 2000, shortly before she went to police. T.M. attributed this episode primarily to A.B.'s marriage to her father.
All of the adults in the home smoked marijuana, and in some instances, allowed some of the children to smoke marijuana. B.B. at some point kept a couple of plants in a closet. T.M. asked him why he was permitted to "smoke grass," and he said, "The Lord has decided." Whenever they had money, B.B. and T.B. continued to smoke marijuana, with B.B. smoking as much as six to seven times a day, and T.B. smoking as much as three to four times a day. E.B. was given marijuana by his father a couple of times when he was five years old. K.K. also smoked it a few times, as did J.B., who said that B.B. did not want him to have it, but his mom, T.B., said it was okay.
Several witnesses, including T.M., testified to various incidents of physical abuse on the part of B.B., although none resulted in serious injuries.[3] B.B. also confined the children on numerous occasions, either to their rooms or to the house or yard, with *1005 some of the children being confined for weeks at a time. He also withheld food from some of the children as a form of punishment, sometimes for as long as three or four days, but T.B. apparently disliked this form of punishment.
Experts testified that living in this household had a negative effect on the children. A therapist testified that a number of the children are suffering as the result of physical and emotional abuse. She also said that it would be very confusing for the children to live in a polygamous household. A licensed mental health counselor testified that domestic violence almost always negatively affects children in the household. For example, boys sometimes become aggressive. A psychiatrist who evaluated T.M. said her testing revealed that T.M. has a personality disorder with obsessive compulsive features. She felt that the polygamy could have a negative effect on the children, but that the "extreme abuse" related by T.M. would have a much, more serious effect.
B.B. and T.B. denied any abuse of the children, including A.B. They testified at length that they had provided appropriate care for all of the children, including medical and dental care. They also testified they did not generally use force to discipline the children, preferring time outs or other alternatives. They denied giving the children any marijuana, although they admitted they sometimes used it themselves "for medicinal purposes." B.B. testified that they tried to practice consecration, which was sharing everything they earned. They also home schooled the children, but let them do extracurricular activities for socialization. They read scriptures three times a day for 15 minutes and had church on Sunday. They acknowledged they believe in polygamy, but denied that it had caused B.B. to marry his daughter and/or S.K. B.B. denied ever hitting T.M., but said they had physical struggles due to her illness.
Several of the children confirmed that they always had adequate food and clothing, and were well cared for. The children claimed to be involved in outside activities, and went to the dentist and doctors when needed. Several of the children also testified that their father was not guilty of any physical abuse, and that he typically disciplined them through grounding or taking away their privileges. Some denied that they had ever missed meals.
Third-party witnesses also testified that the children were well cared for. They said they lived near the family, that the children always appeared clean and well fed, that the children participated in extracurricular activities, such as skating in the park, and that they never saw any signs of abuse by B.B. Among these witnesses was Kevin Barr, who lived with and helped support the family.
In its final order, the trial court found that B.B. and T.B. had failed to provide adequate medical care to the children on several occasions, resulting in a low level of medical neglect which was acquiesced in by the mothers. However, the court concluded that the "abuse and medical neglect has not resulted in a significant impairment to any of the childrens' physical health." The court concluded that T.M. was a victim of domestic abuse from B.B. over many years and that she suffers from post-traumatic stress disorder. It also concluded that this abuse had been witnessed by the children and had an adverse impact on their emotional well-being. The court refused to find that the children were victims of excessive corporal punishment, but noted that some of the children had been confined as punishment sometimes for "weeks of room confinement." The court found that the children's education was "sporadic" and that most were *1006 several grades behind when they were removed from the home. The court noted that all of the adults believed in polygamy. It also noted that B.B. considered himself a prophet and believed he had the authority to prescribe marijuana. All of the adults were found to have used marijuana in the home while the children were present, and it was found that B.B. gave marijuana to several of the children. The court agreed with DCF that the children were aware that B.B. practiced polygamy and noted expert testimony that the children suffered adversely due to living in this environment. The court found that B.B. had told his family that he had received various revelations from God, among them a revelation that he was to marry his daughter, A.B. and have two children with her, and that he was to marry his stepdaughter, S.K. The court further found credible testimony indicating that B.B. had married A.B. and S.K., and specifically found that B.B. had engaged in sexual relations with his daughter and had tried to convince his step-daughter to have sex. Regarding testimony to the contrary, the court stated:
There was disputed testimony regarding the sexual relationship with [A.B.]. The testimony of [S.K.] and [T.M.] was credible. The testimony of [T.B., B.B., and A.B.] regarding that relationship, this Court did not believe. [A.B.] is the victim of sexual abuse. This abuse has been proven by clear and convincing evidence.
The court terminated B.B.'s and T.B.'s parental rights to A.B. due to the sexual abuse and determined that termination of these rights was in the child's best interest. However, the court refused to terminate the parental rights of B.B. and/or T.B. to their remaining children, including their only remaining daughter, S.K. The court reasoned that the sexual abuse of A.B. could not serve as the sole basis to terminate the parental rights of the remaining children, and that termination was improper in the absence of evidence that the parents posed a substantial risk of imminent harm to any of the boys. The trial court also found that termination was not the least restrictive means of protecting their only remaining daughter. The court found the children dependent and ordered them continued in their current placements.
The Department has appealed that portion of the final judgment which refused to terminate the parental rights of B.B. and T.B. to all of the children other than A.B. The Department argues that the trial court erroneously assumed that it was required to prove a "nexus" between the abuse to A.B. and the likelihood of future abuse to the remaining children, in order to establish a basis for termination. The Department points out that the cases relied on by the trial court involved dependency adjudications made on the basis that the children involved were at risk for prospective abuse and/or neglect. See, e.g., In re M.F. v. Florida Department of Children and Families, 770 So.2d 1189 (Fla.2000); Eddy v. Department of Children and Family Services, 704 So.2d 734 (Fla. 5th DCA 1998); Denson v. Department of Health and Rehabilitative Services, 661 So.2d 934 (Fla. 5th DCA 1995). To be found dependent on this basis, the statute requires the child to be "at substantial risk of imminent abuse, abandonment, or neglect by the parent or parents or legal custodians." § 39.01(14)(f), Fla. Stat. (1999); M.F.; Denson.
A similar approach historically was taken by Florida's courts in termination cases involving the prior abuse or neglect of siblings. In such cases, the State generally was required to show that the parent abused or neglected another child, and *1007 that the current child is at substantial risk of abuse or neglect. This generally required proof that the parent suffered from a condition that made probable the prospect of future abuse or neglect of another child and that the condition was one which was likely to continue. Padgett v. Department of Health and Rehab. Servs., 577 So.2d 565 (Fla.1991).
We agree with DCF that the cases relied on by the trial court are inapposite to this case, which involves termination of parental rights for "egregious abuse" pursuant to section 39.806(1)(f), Florida Statutes. This statute authorizes termination of parental rights:
(f) When the parent or parents engaged in egregious conduct or had the opportunity and capability to prevent and knowingly failed to prevent egregious conduct that threatens the life, safety, or physical, mental, or emotional health of the child or the child's sibling.

1. As used in this subsection, the term "sibling" means another child who resides with or is cared for by the parent or parents regardless of whether the child is related legally or by consanguinity.
2. As used in this subsection, the term "egregious conduct" means abuse, abandonment, neglect, or any other conduct of the parent or parents that is deplorable, flagrant, or outrageous by a normal standard of conduct. Egregious conduct may include an act or omission that occurred only once but was of such intensity, magnitude, or severity as to endanger the life of the child.
[Emphasis supplied.] Under this statute, egregious abuse directed at one sibling is sufficient, standing alone, to support termination of parental rights to another child, without requiring additional proof to establish a likelihood that remaining children will be abused. In the Interest of B.S., 697 So.2d 914 (Fla. 2d DCA 1997). This statute represents a legislative expression that parents who have committed egregious acts of abuse against one child pose an unacceptable risk that they will abuse their remaining children. In short, under the statute, the egregious sexual abuse of A.B. would be independent statutory authority for termination of parental rights to other children, assuming, of course, the "manifest best interests" requirement for parental rights' termination is met. § 39.810, Fla. Stat. See In re J.M.M., 795 So.2d 1034 (Fla. 2d DCA 2001).
The trial judge's error on this point was understandable because Florida's courts have not yet fully examined the implications of legislation such as section 39.806(1)(f), Florida Statutes, or section 39.806(1)(i), Florida Statutes, both of which authorize a parent's conduct toward one sibling to serve as a sufficient ground for termination as to a different child. Many Florida courts appear to continue to rely on Padgett exclusively in "prospective abuse" termination cases. It appears, however, that Padgett, which was decided under the 1987 statutes, must be applied in light of the subsequent enactment of section 39.806(1)(f) in 1990 and 39.806(1)(i), enacted in 1998.
C.W. v. Department of Children and Families, 814 So.2d 488 (Fla. 1st DCA 2002), a recent decision out of the First District Court of Appeal examining a termination of parental rights pursuant to section 39.806(1)(f) and (i) based on conduct directed toward a sibling, exemplifies the current uncertainty in the law. The C.W. case generated three separate opinions. Two judges voted to affirm the parental rights termination, finding these statutory provisions to be sufficient authority do so. Judge Ervin, however, wrote an interesting dissent that echoed concerns we recently addressed in A.B. v. *1008 Department of Children and Families, 816 So.2d 684 (Fla. 5th DCA 2002). Judge Ervin questioned terminating parental rights to a child because of acts or omissions involving a different child without some evidence that the past abuse of the first child was predictive of future abuse of the other child. C.W., 814 So.2d at 495. He suggested that legislation authorizing such an outcome might be an unconstitutional interference with a parent's liberty interest in preserving their care, custody and management of their children. Id.
In A.B., we acknowledged that there may be constitutional implications to such an approach because termination proceedings involve a parent's constitutionally protected liberty interest in the care, custody, and management of his or her child. A.B. v. Department of Children and Families, 816 So.2d at 685; see also Padgett, supra; In re S.S., 723 So.2d 344 (Fla. 2d DCA 1998); Lewis v. Department of Health and Rehab. Servs., 670 So.2d 1191 (Fla. 5th DCA 1996). In A.B., the court had terminated the mother's parental rights, relying in part on section 39.806(1)(i), Florida Statutes, which permits termination of parental rights "when the parental rights of the parent to a sibling have been terminated involuntarily." On appeal, the mother urged that the statute was unconstitutional on its face, in that it deprived parents of the fundamental liberty interests they have in raising their children by ostensibly allowing for termination of parental rights without regard to other circumstances. In finding the statute constitutional, this court found that evidence of a prior termination of parental rights created what was in effect a presumption sufficient to support termination, but which was subject to rebuttal by the parents. In A.B., we approached the issue by recognizing that the parent faced with loss of parental rights to a child based on the parent's egregious abuse or neglect of another child must have the right to show the lack of a predictive relationship between the past abuse of one child and the prospective abuse of another.[4] 816 So.2d at 686.
In one sense, this case offers an example that will help to illustrate the problem. Section 39.806(1)(f) would authorize termination of B.B.'s parental rights to his sons based on his egregious abuse of A.B. Yet, there is practically zero likelihood that B.B.'s sexual abuse of little A.B. is predictive of his sexual abuse of his sons. We doubt the Department would dispute that. Manifestly, B.B.'s motivations and interests lie elsewhere; he does not see his sons as sexual targets. B.B. should be allowed to establish that the circumstances leading to termination of his parental rights to A.B. do not serve to predict that he will sexually abuse his sons. On the other hand, there is no reason why the abuse has to be symmetrical. B.B. may not intend to abuse his sons sexually but he has apparently inculcated in his sons the same religious practices that endorse crimes such as polygamy and the sexual battery of female children The boys were living in a household where the father is sleeping with one twelve-year-old sister and trying to seduce another. These same religious views also encouraged their children not only to lie but to commit perjury in order to protect the adults from prosecution for their crimes. *1009 In sum, we conclude that the lower court erred in concluding that the egregious abuse of A.B. and S.K. could not support termination of parental rights as to the other children.
Ironically, the reverse of the situation presented in the case of the male children is present as to S.B., the remaining female child. Given the nature of the abuse perpetrated on A.B. and S.K. and the parents' deceit and concealment of their conduct toward these two girls, the salutary purpose of legislation like sections 39.806(1)(f) and (i) is manifest. On this record, it is inconceivable that this female child would ever be exposed again to either of these parents. The trial court appeared to reject termination for this child because she was out of the home and, therefore, safe from parental abuse. Therefore, termination was not the "least restrictive means" of protecting her. This is not what "least restrictive means" means. Obviously, if a child is separated from its parents the abuse will stop due to lack of access. The "least restrictive means" test, which comes out of Padgett, is not intended to preserve a parental bond at the cost of a child's future. Rather, as can be seen from the context of Padgett, it simply requires that measures short of termination should be utilized if such measures can permit the safe re-establishment of the parent-child bond. The Supreme Court of Florida in In the Interest of T.M., 641 So.2d 410 (Fla.1994), made clear that, in a case of egregious abuse, the concept of "least restrictive means" does not require that a parent be given a performance agreement or placement plan before termination can occur because in such extraordinary circumstances "termination of parental rights without the use of plans or agreements is the least restrictive means." Id. at 413 (emphasis added).[5]
The parents' cross-appeal, which challenges the trial court's termination of their rights to A.B., is without merit. Accordingly, we reverse and remand this case for reconsideration in light of this opinion.
AFFIRMED in part, REVERSED in part, and REMANDED.
HARRIS and PETERSON, JJ., concur.
NOTES
[1] One of the boys, A.B., who was born on June 24, 1983, has now reached the age of majority.
[2] A.B. testified that she had recanted her statement to Detective Scarpati in June or July 2000 when she wrote a letter to her parents. In the letter she stated that although there was a videotape of the alleged wedding, it was actually a videotape of a religious ceremony which had been altered by T.M. to look like a wedding.
[3] A number of witnesses testified to an incident which occurred in 1990, when B.B. allegedly dragged T.M. into their trailer by the hair, then tied her up. He told the children she was an animal and an edema, and poured a glass of water over her head. He also beat her during the course of an hour. This incident occurred around the time of T.M.'s first breakdown in 1990. T.M. also said that B.B. beat her several times a week before she moved to New Jersey for several years in 1991. B.B. also beat up his son, E.B., in the summer of 1999, knocked K.K. around the bathroom, hit J.B. on another occasion, and may have punched his daughter, S.B., and dropped his son, A.B., on yet other occasions. He also hit E.B. with a marble trophy, hit A.B. with a bag of apples, and hit T.B. in the mouth with his elbow when she tried to protect S.B.
[4] Judge Ervin suggests in C.W. that DCF has the constitutional burden to prove a link between the past egregious abuse and "potentially injurious conduct to another child as yet unharmed." 814 So.2d at 496. This would require the state to prove a negativei.e. nothing about the parent is materially different; nothing has changed. It seems more logical and more efficient, and should be constitutionally adequate, to give the parent the opportunity to be heard and to show what has changed.
[5] But see In re D.W., 793 So.2d 39, 40 (Fla. 2d DCA 2001) where a mother who had committed egregious abuse on children could not have parental rights terminated without being given an opportunity to show she could maintain a safe relationship with her children on a limited basis. That case was driven, however, by the fact that the children remained in their father's custody and the mother had diligently tried to correct problems that had led to an isolated incident.