WARNER, J.
The Department of Children and Families, the Guardian ad Litem program, and the child all appeal an order of the trial court declining to terminate the rights of the father of the child. Without ever determining the manifest best interest of the child, the trial court determined that, although grounds for termination existed, termination was not the least restrictive means of eliminating harm to the child. Because the trial court failed to determine the manifest best interest, we reverse for further proceedings.
J.C., a male child, was born on December 30, 2008. The mother came to the attention of DCF in December 2008, when she tested positive for methadone while pregnant with J.C. Although J.C. tested negative for drugs at his birth, DCF filed a dependency petition after J.C.’s birth and requested that the parents complete a case plan. The court left the child with the mother, who was living with her parents, and ordered weekly visitation for the father. In January 2009, the father submitted to a drug screen, which was positive for marijuana.
In March 2009, DCF sheltered the child based on the mother’s ongoing substance abuse and history of non-compliance with DCF services. Likewise, DCF determined that it was not appropriate to place the child with the father, in light of his ongoing marijuana use and his previous history with DCF. At the shelter hearing, the court placed the child in licensed care and gave the father supervised visitation with the child.
At a mediation held in April 2009, the parties reached an agreement on the case plan tasks for the parents. In particular, the father agreed to complete the following case plan tasks: a) undergo individual and parental counseling; b) complete a substance abuse evaluation; c) complete 10 consecutive negative drug screens; d) participate in supervised visitation with the child; e) submit to a paternity test; f) demonstrate stable income; g) pay $262.50 in child support or provide in-kind services; h) refrain from any violations of law; i) maintain stable housing; and j) maintain contact with the DCF. The case plan and mediated settlement agreement further required the father to meet with the case manager at least once per month and to notify the DCF within 72 hours if he changed his phone number or address.
A few days after the mediation, the trial court adjudicated the child dependent based upon the father’s consent. The grounds for the adjudication of dependency included the father’s substance abuse issues, his previous history with DCF (which included having his rights terminated as to a different child), his failure to comply with previously offered services, and his failure to provide for J.C.’s care. The court approved the mediated case plan, which provided for a goal of reunification/adoption and set forth a goal date of December 4, 2009.
*159 Essentially, the father failed to complete any of the case plan tasks. And after visiting with the child a few times in April 2009, he disappeared. Although the DCF case managers attempted to find him, they never located him. He did not contact his case manager or his attorney for the next year.
DCF filed a petition to terminate both parents’ rights in November 2009. While the petition was pending, the father contacted DCF in April 2010 wanting to see his son. DCF refused to provide additional services to the father, since he had abandoned his child during the preceding year and failed to comply with the case plan. On his own, however, the father attended drug counseling and parenting classes, and he was allowed to begin visits with his son. At first the child did not interact with him and viewed him as a stranger, but the child later began relating to him, more like a playmate, according to the case manager.
After several continuances of the final hearing, to which DCF objected, the case finally went to trial in October 2010. The child’s foster parents are willing to adopt, but the father sought reunification with the child. At trial, the father attempted to place the blame on DCF for the lack of communication and his failure to complete his case plan. The father gave various explanations for his lack of contact with DCF and with his son. The trial court, however, found that the father’s explanations were not credible.
The social worker assigned to enable visitation between the father and child testified that the father and child interacted very well. The father acted appropriately with the child, and the child seemed to enjoy their time together. She observed that a bond was beginning to form between the two. However, a much greater bond existed between the foster mother and the child.
Because the child had some behavioral problems, he was being seen by a child therapist. She observed one visit between the father and son. In her opinion, the child and father were not bonded. The child’s primary attachment was to the foster mother. Removing this bond would harm the child, although it is not impossible to change primary attachment figures in a child’s life. However, harm to the child in the form of behavioral problems and inability to form good relationships in the future can occur. If required, a gradual process of assimilation between the new primary caretaker and the child would be optimal and would best reduce the harm to the child. In her opinion, however, it was not in the child’s best interest to change his placement.
DCF presented the evidence of the father’s complete failure to complete any of his case plan as well as his disappearance for an entire year of the child’s life. In his defense, the father presented evidence of his present attempts to complete the same tasks that were in his case plan. He is engaged to a woman with a child whom he helps parent. They live in a home owned by his fiancée’s mother and pay her rent. He is employed, although his fiancée earns the greater amount of money in the household. He detailed the efforts he has made to stop his drug addiction and to develop his parenting skills. And he provided pictures of his home and the room he has decorated for his child should he be returned.
After hearing all the evidence, the trial court found that statutory grounds for termination were proven in that the mother abandoned the child. It also found that the father abandoned the child between May 2009 and April 2010, and failed to substantially complete his case plan tasks *160 within nine months. The court further found that DCF made reasonable efforts to assist the father in completing the case plan. Notwithstanding the court’s findings regarding the father’s non-compliance, the court praised the father’s efforts subsequent to the case plan.
The court then made a manifest best interest finding but only as it related to the mother. The court considered the factors in section 39.810, Florida Statutes, and made the following findings, which we summarize as follows:
a) The only suitable permanent custody arrangement with a relative of the child is with the father. In addition the child has been in a preadoptive placement for over six months and has integrated into that family;
b) The mother does not have the ability and disposition to provide for the child’s food, clothing, and medical care, but the father does;
c) The mother does not have the capacity to care for the child’s safety and well-being, but the father does, and the child’s physical mental and emotional health would not be endangered upon his return to the father;
d) The child is receiving therapy for his behavioral problems;
e) The child has no relationship with his mother, but the child recognizes the father and sees him as a playmate;
f) The child’s current custodians are willing to adopt but the father seeks reunification;
g) The child “has bonded with his current custodians and their children. This bond can be transferred to the father. The likelihood that J.C. will enter into a more stable and permanent family relationship, either in his pre-adoptive placement or with his father, as a result of a permanent termination of mother’s rights is very high”;
h) There is a loving and warm relationship between the child and his foster family, but with assistance, this bond could be transferred to the father;
i) The child is too young to express a preference; and
j) The Guardian ad Litem recommended a termination of parental rights of both the mother and father.
The court terminated the parental rights of the mother but denied termination of the father’s rights. The court never made an explicit determination as to whether termination of the father’s rights was in the child’s best interest. Instead, the court determined that termination of the father’s parental rights was not the least restrictive means to protect the child from harm. The court explained: “The father’s success in completing the case plan tasks and his persistence in establishing a relationship with his son demonstrate that reunification is a reasonable and less restrictive alternative to terminating his parental rights.” The court thus re-adjudicated the child dependent and ordered the Department to file a new case plan for reuniting the father with the child. This appeal follows.
There is a two-step statutory process to terminate parental rights. First, the trial court must find a ground for termination under section 39.806. See Rathburn v. Dep’t of Children & Families, 826 So.2d 521, 523 (Fla. 4th DCA 2002). Second, the court must consider under section 39.810 what is in the manifest best interest of the child based upon all the relevant criteria. Id. Finally, because of a parent’s fundamental liberty interest in the care and custody of his child, before permanently severing the parental relationship, the state must establish that termination of parental rights is the least restrictive means of protecting the child *161 from harm. See Padgett v. Dep’t of Health & Rehabilitative Servs., 577 So.2d 565, 571 (Fla.1991); J.G. v. Dep’t of Children & Families, 22 So.3d 774, 775 (Fla. 4th DCA 2009). “This means that HRS ordinarily must show that it has made a good faith effort to rehabilitate the parent and reunite the family, such as through a current performance agreement or other such plan for the present child.” Padgett, 577 So.2d at 571.
Once a court determines, as it did here, that a ground for termination of parental rights has been proved, section 89.810, Florida Statutes, requires that “[i]n a hearing on a petition for termination of parental rights, the court shall consider the manifest best interests of the child.” (emphasis added). Section 39.810 further provides that “[f]or the purpose of determining the manifest best interests of the child, the court shall consider and evaluate all relevant factors....” While the trial court conducted the manifest best interest determination with respect to the mother, it did not conduct the same analysis once it determined that a ground for termination of the father’s rights existed. The analysis of the statutory factors applied to the mother do not necessarily show that the best interests of the child have been determined as to the father.
The statute provides enumerated factors that the court should consider in evaluating the manifest best interests of the child:
For the purpose of determining the manifest best interests of the child, the court shall consider and evaluate all relevant factors, including, but not limited to:
(1) Any suitable permanent custody arrangement with a relative of the child. However, the availability of a nonadop-tive placement with a relative may not receive greater consideration than any other factor weighing on the manifest best interest of the child and may not be considered as a factor weighing against termination of parental rights. If a child has been in a stable or preadoptive placement for not less than 6 months, the availability of a different placement, including a placement with a relative, may not be considered as a ground to deny the termination of parental rights.
(2) The ability and disposition of the parent or parents to provide the child with food, clothing, medical care or other remedial care recognized and permitted under state law instead of medical care, and other material needs of the child.
(3) The capacity of the parent or parents to care for the child to the extent that the child’s safety, well-being, and physical, mental, and emotional health will not be endangered upon the child’s return home.
(4) The present mental and physical health needs of the child and such future needs of the child to the extent that such future needs can be ascertained based on the present condition of the child.
(5) The love, affection, and other emotional ties existing between the child and the child’s parent or parents, siblings, and other relatives, and the degree of harm to the child that would arise from the termination of parental rights and duties.
(6) The likelihood of an older child remaining in long-term foster care upon termination of parental rights, due to emotional or behavioral problems or any special needs of the child.
(7) The child’s ability to form a significant relationship with a parental substitute and the likelihood that the child will enter into a more stable and permanent family relationship as a result of perma *162 nent termination of parental rights and duties.
(8) The length of time that the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity.
(9) The depth of the relationship existing between the child and the present custodian.
(10) The reasonable preferences and wishes of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.
(11) The recommendations for the child provided by the child’s guardian ad litem or legal representative.
§ 39.810, Fla. Stat. (2010).
While the trial court found that, as to the mother, the father as well as the foster family, could constitute a suitable family placement, the court’s analysis does not comport with the statute when applied to the father. As to the father, there is not a suitable relative placement, but in any event because the child has been in a stable or preadoptive placement for over six months, the availability of another placement may not be considered as a ground for denying termination. Undoubtedly, the Legislature considered that it would not be in the child’s best interest to disrupt the child’s stable and lengthy placement with another family.
The court found that the father had the ability to provide for the child financially and the capacity to provide for the child’s mental and physical health. Little evidence was produced on this issue, because the father has never had to provide for the child’s physical and emotional health.
More importantly, while the court found that the child presently had behavioral issues and was receiving therapy, there was no evidence that the father had the capacity to deal with those issues. In fact, only the child’s therapist testified as to the child’s issues, which involve aggressive and anxious behaviors. She told the court that the child’s behavior issues would most likely increase should the child be removed from his present placement, and this would generally cause long-term relational problems.
The court did not find that the child had a significant relationship as yet with the father. Although the child was bonded to the foster family, the court found that the bond could be transferred to the father. By this determination, the court did not analyze what was in the best interest of the child but whether the father/child relationship could be resurrected. Moreover, while reintegration' was possible, the child’s therapist testified that it would have to occur over a long period of time, thus prolonging the time the child would be in foster care and lacking stability. Because the child is at the critical stage in developing his primary attachments, the therapist testified that a change during this period of his life would produce more harm. The therapist also maintained that it would not be in the child’s best interest to be removed from his current placement.
The child has existed in his present placement for over a year and recognizes his foster mother as his primary attachment. He is very bonded to her. The foster family has expressed a desire to adopt J.C. The Guardian ad Litem, the case manager, and the therapist all recommended termination of the father’s rights.
From a review of the statutory factors, many appear to lean toward a determination that it would be in the child’s best interest to terminate the father’s rights so that the child could remain in a stable, loving family and not experience any harm from a change in placement. That is why the trial court’s best interest analysis, fo *163 cused on the termination of the mother’s rights, does not satisfy the statutory requirement as applied to the father. The court must conduct this analysis before denying termination. This is not an issue for the appellate court to decide in the first instance on appeal.
Without performing the best interest calculation, the court determined that termination was not the least restrictive means of protecting the child from harm. The “least restrictive means” test, however, is not intended to preserve a parental bond at the cost of a child’s future. Dep’t of Children and Families v. B.B., 824 So.2d 1000, 1009 (Fla. 5th DCA 2002). That standard, as noted in Padgett, means that DCF has provided a case plan with the provision of services and the time to effectuate a reunion between parent and child. See In re K.W., 891 So.2d 1068 (Fla. 2d DCA 2004). The Legislature has established that time is of the essence in completing a case plan. “The failure of the parent ... to substantially comply with the case plan for a period of 9 months after an adjudication of the child as a dependent child or the child’s placement into shelter care, whichever occurs first, constitutes evidence of continuing abuse, neglect, or abandonment ....” § 39.806(1)(e)1., Fla. Stat. In fact, the Legislature reduced the time for substantial completion from one year to nine months in 2008. See Ch. 2008-245, Laws of Florida.
KW. is similar to this case. There, DCF sought to terminate the parental rights of a mother to her child. When the child was born, both mother and child tested positive for drugs. After removal, the mother was provided with a case plan. When she did not substantially comply, DCF sought termination which the trial court granted. The mother, S.S., contested the termination on appeal on the ground that it was not the least restrictive means because long-term relative placement was available. In rejecting long-term placement as opposed to termination, the court summarized:
In the case before us, the record demonstrates that S.S. was provided with a case plan and ample time to comply with the requirements and seek reunification. She failed to avail herself of this opportunity. Furthermore, this child has been with the maternal cousin since she was only two months old. The record supports the trial court’s finding that the child has established a parental bond with the cousin and that, due to the limited contact that S.S. has had with the child, there are minimal or no emotional ties existing between S.S. and the child. While the court is required to consider the least restrictive means, the least restrictive means test is not intended “to preserve a parental bond at the cost of a child’s future.” Dep’t of Children & Families v. B.B., 824 So.2d 1000, 1009 (Fla. 5th DCA 2002). Since there is little or no bond to protect and there was never a parent-child relationship to reestablish, long-term relative placement was not in the best interest of the child and was not required by the “least restrictive means” test.
K.W., 891 So.2d at 1070.
Similarly, in this case the father was given a case plan and had over a year to complete it. Instead, he disappeared from his child’s life for an entire year. And as in K.W., there is no bond to protect nor was there ever a parent-child relationship to reestablish. The child has developed a substantial bond with his foster family. As defined in Padgett, the least restrictive means test was clearly met in this case. The father’s belated attempts to become a good father amount to too little too late in terms of the least restrictive means test. *164 The child’s interests are paramount over the father’s desire to now parent his child, where the child would have to remain in foster care for a substantial period of time to effectuate a reunion without harming the child further. The trial court’s conclusion on this issue not only was not supported by clear and convincing evidence, it was not supported by competent substantial evidence.
Thus, this case comes down to the missing analysis of what is in the child’s manifest best interest — termination or reunification? We reverse and remand for further proceedings for the court to determine this issue. The court may take additional testimony in making its decision.
POLEN and LEVINE, JJ., concur.