DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

_____

In the Interest of E.A., a child.

N.U.,

Appellant,

v.

DEPARTMENT OF CHILDREN AND FAMILIES and
STATEWIDE GUARDIAN AD LITEM OFFICE,

Appellees.

No. 2D2025-1871
_____

June 5, 2026

Appeal from the Circuit Court for Pasco County; Linda H. Babb, Judge.

Patricia Alten of Alten & Cangro, Tampa, for Appellant.

Bruce Bartlett, State Attorney, and Leslie M. Layne, Assistant State Attorney, Sixth Judicial Circuit, Pasco County, for Appellee Department of Children and Families.

Sara Elizabeth Goldfarb, Statewide Director of Appeals, and Stephanie E. Novenario and Mercy Almaguer, Tallahassee, for Appellee Statewide Guardian ad Litem Office.

SMITH, Judge.

N.U. (the Mother) appeals the final judgment terminating her parental rights to ten-year-old E.A. (the Child). Because the Department failed to establish that the continued involvement of the Mother would

threaten the life, safety, well-being, or physical, mental, or emotional health of the Child under section 39.806(1)(c), Florida Statutes (2025), and because termination was not the least restrictive means of protecting the Child from harm, we reverse and remand with instructions.[1]

## I.

This case involves two removals.  The Child has been diagnosed with Level 3 Autism and requires twenty-four-hour care, and the Mother has a history of mental illness.  The Mother has been diagnosed with Bipolar Disorder, Post Traumatic Stress Disorder, Attention-Deficit/Hyperactivity Disorder (ADHD), and anxiety.  The Child was first sheltered in June of 2023 (2023 Case) based upon allegations that the Child was being inadequately supervised.[2]  As part of the 2023 Case, the Mother, who had been previously Baker Acted on several occasions, was offered a case plan with a goal of reunification.  The Mother substantially completed that plan; the Mother maintained regular visits with the Child, took specialized classes for parenting a child with autism, moved in with her parents for support, went to therapy, took her medications, and maintained a full-time job.  In June of 2024 the Mother was reunified with the Child.  The trial court relinquished jurisdiction and closed the 2023 Case on December 3, 2024.  However, shortly thereafter, the Mother stopped taking her medications, her mental health deteriorated,

---

[1] The Final Judgment also terminates the parental rights of C.A. (the Father).  The Father has not appealed the Final Judgment; accordingly, our opinion is limited to those portions of the Final Judgment relating to the Mother.

[2] On several occasions the Child wandered out of the home and was found outside unsupervised.  The Mother remedied the situation and installed locks on the doors so that the Child could not leave the home unattended.  No evidence established that this issue has recurred.

and she was Baker Acted once more. The Child was sheltered a second time in March of 2025.

Without giving the Mother another case plan, the Department filed a Petition for Termination of Parental Rights on March 17, 2025. The Petition alleged that despite the court having previously found the Mother to be in substantial compliance with her prior case plan, since reunification, the Mother has not remedied the reasons for the initial removal because she failed to take her medication, which culminated with the Mother being Baker Acted in February 2025.

The petition sought termination on the following grounds: (1) the Mother's continued involvement with the child threatens the life, safety, well-being, or health of the child irrespective of the provision of services pursuant to section 39.806(1)(c); (2) chronic abuse pursuant to section 39.806(1)(g); and (3) the Child was out of care for twelve of the last twenty-two months and the Mother failed to substantially complete her case plan pursuant to section 39.806(1)(e)(3). An adjudicatory hearing was held on June 20, 2025.

The Mother testified acknowledging her history of mental illness and explaining her battle in finding the right dose and combination of medications. She described the events leading up to the second shelter of the Child. She testified that in January 2025, prior to a family cruise, she was prescribed Adderall for her ADHD by her general practitioner. She did not speak to her psychiatrist before starting this new medication. She stopped taking her other medications because she wanted to have a good time on the cruise and her medications could make her feel numb. While on the ship the Mother suffered an anxiety attack and sought medical attention. After the cruise, the Mother's mental health continued to deteriorate, and she was Baker Acted in February 2025.

The Mother testified that since being released from the hospital she has followed the recommended treatment, which was to follow up with her psychiatrist and therapist and to stay on her medications—despite not being offered any additional services by the Department.

When asked if she had been off her medications every time she had been Baker Acted, the Mother said, "no," and that sometimes her medications had been adjusted or needed to be adjusted, but she had not stopped taking her medications every time she had been hospitalized. However, she was unable to recall all the details surrounding her various Baker Acts.[3] The Mother testified that she now understands the importance of speaking to her psychiatrist before starting any new medication and is finally in a good place where she is stable on the medications she is currently taking. The Mother stated that she is willing to continue going to therapy, she is willing to have someone count her pills and report whether she is taking her medication, and she is willing to get a shot every month in lieu of taking daily pills, if that is an option.

Regarding the Child, the Mother testified that she arranged for the Child to receive Applied Behavior Analysis (ABA) therapy services in the home and that she believed the therapy has been helpful to the Child.

---

[3] The Department attempted to elicit every detail from the Mother about whether she recalled hallucinating or saying or doing "xyz" during one of her mental breaks. The Mother was unable to recall every detail. However, amongst the medical records admitted at trial, it was well documented that the Mother "[s]truggles to recall traumatic events in her past." The Department offered no evidence that the Mother made any comments about or harmed the Child physically or emotionally at any time. But it is undisputed that when the Mother is having a mental health episode she is unable to care for the Child. As to the recent episode, there was no competent substantial evidence that the Child had inadequate supervision on the cruise or after the family returned home.

However, that therapy has been interrupted each time the Child has been sheltered. The Mother testified that the Child has never been physically harmed by the Mother's mental health issues. The Mother planned to continue living with her parents. She acknowledged that there was some conflict with the Grandmother, explaining that at times she believed the Grandmother was a trigger for her and was the source of her mental deterioration and resultant Baker Acts. However, she told the court that she no longer believes that the Grandmother was the cause of her mental health issues and believes it is beneficial to have the Grandmother living with her and the Child because she is helpful when it comes to discipline and supervision. She told the trial court that she and the Grandmother had been going to therapy to work on their relationship and to learn ways to work better together for the Child.

The registered behavioral therapist who provided ABA therapy for the Child testified that she worked in the home to help the Child practice life skills and strategies for behaviors that can impede daily life. She stated that the Child had become significantly more verbal over the course of the therapy, which occurred between November 2024 and February 2025, and stopped after the latest removal.[4] The Mother was always home and engaged during the sessions. She acknowledged that she witnessed some arguments between the Mother and Grandmother but described them as "pretty average mother daughter conversations."

A school behavioral specialist and instructional assistant working at the Child's school testified that they thought the Child's behavior had been better since she has been in foster care; they stated they have seen

---

[4] The Child's ABA therapy was not a service provided by the Department for the Child; it was the Mother who sought and obtained ABA therapy on behalf of the Child—without Department assistance.

improvements in the Child's grooming and diet. The behavioral specialist testified that she has concerns about the Child being returned to the Mother; specifically, she worries about the Child not having proper nutrition. But she also testified that she had a conversation with the Mother about the Child's diet "a few months ago" and that after that meeting, the Mother stopped sending in the "bad foods" identified and started sending in the foods they suggested.

The Child's current caregiver testified that she had initially been assigned as a respite in-home caregiver, hired by the Mother sometime after reunification and prior to the closure of the 2023 Case. The Child has been in her care since March 2025. The caregiver testified that the Child was not receiving ABA therapy or medication for her autism under her care because the pills are not helping; instead, she was using natural tea and trying to "clean her system" with green juice and other things "that clean that autism from the brain."[5] The caregiver told the trial court that she works three jobs and that her wife also has a full-time job and often works overtime. The caregiver testified the Mother had provided financial support from day one, including clothes and diapers for the Child.

The child protective investigator (CPI) testified that she was assigned to this case in the middle of February 2025 after receiving a call from the Grandmother, who voiced concerns related to the Mother's mental health and whether she was taking her medications. The CPI testified that with regard to the second shelter of the Child, the CPI "staffed the case for sufficiency" on the basis of "inadequate supervision," and she testified that "the danger threat would've been that the caregiver

---

[5] The Child's medication was required to be counted as part of the case plan in the 2023 Case.

6

is violent and impulsive." There were no allegations in the petition related to inadequate supervision or that the Mother was a danger to the Child due to any violent tendencies or impulsiveness, nor did the trial court make any findings related to the same.

The case manager testified that she became involved with the Child as part of the 2023 Case and that at that time the Mother was in compliance with her case plan. When asked if the Mother had been taking her medication, she testified that she did not know. The case manager stated that she observed some frustration on the Mother's behalf when interacting with the Child but that she never witnessed any conflict between the Mother and Child. According to the case manager, the Mother has a full-time job, drives herself to work, and can provide food, clothing, medical needs, and necessities for the Child. The case manager opined that the Mother does not have the capacity to care for the Child safely. However, she admitted that she was involved in the case when the Mother had completed her case plan and jurisdiction was terminated. She acknowledged that she had agreed with the reunification.

The guardian ad litem (GAL) acknowledged that the Mother was capable of providing the Child with food, clothing, and medical care, but she did not believe the Mother was capable of caring for the Child without endangering the safety, well-being, or physical, mental, or emotional health of the Child. But the GAL admitted that she had not met with or otherwise interacted with the Mother since the case had been reopened. Nor had she had an opportunity to observe any visitation between the Mother and the Child.

The Mother's psychiatric and psychological evaluations taken in the 2023 Case were admitted into evidence along with the Mother's medical

7

records from each of her hospitalizations. No medical professional or expert testified as to the Mother's mental health or the effects of her mental health on the Child, nor was any psychiatric or psychological evaluation of the Child conducted. *See, e.g., Guardian ad Litem Program v. K.H.*, 276 So. 3d 897, 900-01 (Fla. 3d DCA 2019) (noting the expert testified as to the psychological evaluation of the mother and her inability to parent the child and that the mother was likely to physically harm the child).

As to each of the three grounds alleged in the petition, the trial court found that the Department had met its burden of proof. A Final Judgment on Petition for Termination of Parental Rights was entered on July 7, 2025. In that Final Judgment, the trial court found that the Mother had not demonstrated that she is willing to manage her mental health issues to adequately provide for the special needs of the Child— finding that if the Mother was willing to manage her mental health, "she would have done it already." The trial court also found that the Mother had failed to adequately address her mental health issues, which amounted to a prolonged period of harm to the Child that could not be mitigated, regardless of services from the Department. This appeal followed.

## II.

"To grant a petition for termination of parental rights, the trial court must find that the Department proved the allegations supporting termination by clear and convincing evidence." *G.M. v. Dep't of Child. & Fam. Servs.*, 71 So. 3d 924, 926 (Fla. 2d DCA 2011) (citing *E.E.A. v. Dep't of Child. & Fam. Servs.*, 846 So. 2d 1250, 1251 (Fla. 2d DCA 2003)). Additionally, the trial court must find that the Department proved a statutory ground for termination, that termination is in the manifest best

8

interest of the child, and that termination was the least restrictive means of protecting the child. *See R.C. v. Dep't of Child. & Fam. Servs.*, 33 So. 3d 710, 714 (Fla. 2d DCA 2010). Our review is "highly deferential" to the trial court's findings, and we examine the record to determine whether the trial court's findings are supported by competent substantial evidence. *S.H. v. Dep't of Child. & Fams.*, 366 So. 3d 1120, 1124 (Fla. 3d DCA 2022).

### III.

In this case, the Department sought termination of the Mother's parental rights under section 39.806(1)(c), which allows for the termination of parental rights

> [w]hen the parent or parents engaged in conduct toward the child or toward other children that demonstrates that the continuing involvement of the parent or parents in the parent-child relationship threatens the life, safety, well-being, or physical, mental, or emotional health of the child <u>irrespective of the provision of services. Provision of services may be evidenced by proof that services were provided through a previous plan or offered as a case plan from a child welfare agency.</u>

(Emphasis added.) As we have explained:

> [I]n order to terminate parental rights under section 39.806(1)(c), the trial court must find that the child's life, safety, or health would be threatened by continued interaction with the parent regardless of any services provided to the parent. In essence, the trial court must find that <u>any provision of services would be futile or that the child would be threatened with harm despite any services provided to the parent.</u>

*R.W.W. v. Dep't of Child. & Fams.*, 788 So. 2d 1020, 1023 (Fla. 2d DCA 2001) (emphasis added). The Department is not required to offer a new case plan or modify the prior case plan prior to filing its petition for termination of parental rights. *See* § 39.806(3) ("If a petition for

9

termination of parental rights is filed under subsection (1), a separate petition for dependency need not be filed and the department need not offer the parents a case plan having a goal of reunification, but may instead file with the court a case plan having a goal of termination of parental rights to allow continuation of services until the termination is granted or until further orders of the court are issued.").[6]

We acknowledge that "[a] parent's chronic mental illness can indeed undergird a termination of rights." *B.L.H. v. Dep't of Health & Rehab. Servs.*, 670 So. 2d 1072, 1072 (Fla. 2d DCA 1996); *see also K.H.*, 276 So. 3d at 902 (affirming termination of the mother's parental rights where the treating physician testified that the mother was incapable of functioning on her own due to her schizoaffective disorder and was incapable of caring for her child)*; D.B. v. Dep't of Child. & Fams.*, 87 So. 3d 1279, 1282 (Fla. 4th DCA 2012) (holding that futility was established where the father was unable to follow a treatment plan over the course of the eight years that he was provided services for his mental illness). However, a parent's mental illness, "without evidence that those issues have manifested themselves in behavior that poses a risk to the child's well-being, is insufficient to justify termination of parental rights under [section 39.806(1)(c)]." *I.Z. v. B.H.*, 53 So. 3d 406, 409 (Fla. 4th DCA 2011).

We share the trial court's concern about the Mother's commitment to taking care of her own mental health and the well-being of the Child based on her relapse less than a few months after the 2023 Case closed.

---

[6] In this case the Department did not file a petition for dependency or case plan with the goal of termination that would allow for the continuation of services. The Final Judgment indicates that the trial court adjudicated the Child dependent on June 20, 2025, the date of the trial.

However, the record lacks competent substantial evidence supporting the trial court's findings that the Mother's continuing involvement in the Child's life "threatens the life, safety, well-being, or physical, mental, or emotional health of the child irrespective of the provision of services" as required by section 39.806(1)(c).

In *I.Z.*, the child was initially removed from the home in 2002 due to the mother's long history of mental health and anger management problems. 53 So. 3d at 409. That history was dealt with in 2007 when the child was placed in permanent guardianship and the trial court entered its final order terminating the Department's protective supervision upon the agreement of all parties that the mother should be able to maintain contact with the child. *Id.* at 410. The mother in that case maintained regular, meaningful visits with the child; the child's safety was not questioned, and the mother was always loving. *Id.* at 406. In 2009, after the mother was arrested for aggravated battery on her grandmother, the caregivers petitioned to terminate the mother's parental rights, alleging, among other things, that the mother engaged in conduct toward the child demonstrating that her continued involvement was a threat to the child's life, safety, well-being, or physical, mental, or emotional health pursuant to section 39.806(1)(c) and (e), despite a case plan having been filed. *Id.* at 407. The trial court granted the petition. *Id.* On appeal, the court focused on what conduct of the mother "toward the child" demonstrated a threat to the child's well-being. *Id.* at 409. The appellate court noted that the only evidence to support the lower court's finding occurred when the mother gave a gift to the child and the child did not care for the gift, which prompted the mother to raise her voice and tell the child she was "spoiled." *Id.* This incident occurred prior to the permanency order and before the determination that

11

continued visitation with the mother was in the child's bests interest. *Id.* Moreover, that isolated incident occurred more than three years prior to the termination decision. *Id.* The court explained that "[t]he trial court should have given this evidence minimal weight, if any, in considering the petition to terminate the mother's parental rights." *Id.*

Here, much of the case presented by the Department focused heavily on the Mother's mental illness and facts giving rise to the initial shelter of the Child in 2023, which predated the Mother's substantial compliance with the 2023 case plan and her reunification with the Child in June 2024. The school witnesses testified that the Child's behavior has been better since she has been sheltered. They attributed the behavioral improvements to the removal of sugar from the Child's diet, while acknowledging that when they brought this to the attention of the Mother, she responded by sending in healthy snacks. It is unclear from the record whether these witnesses were talking about circumstances that existed prior to the reunification or after her second shelter.

Indeed, the trial court's oral ruling and the written final judgment are littered with findings related to things that happened prior to the reunification and closure of the 2023 Case. At one point in its oral ruling the trial court referenced the facts surrounding the Child's 2023 removal, where the Child was found running around outside in only a diaper without adult supervision. "The trial court should have given this evidence minimal weight, if any, in considering the petition to terminate the [M]other's parental rights." *Id.* (holding the trial court should have given minimal weight to an incident that occurred more than three years prior to the court's decision to terminate the mother's parental rights and after the trial court determined that continued visitation with the mother was in the best interests of the child). The written final judgment makes

12

findings related to the Mother's previous Baker Acts, which happened prior to the reunification. While these things did not warrant termination in the 2023 Case—and in fact, allowed for reunification and a complete relinquishment of jurisdiction—the trial court was now of the opinion that even when she was taking her medications the Mother was not "a good caretaker."

Like in *I.Z.*, the trial court here should have given this evidence minimal weight given that the facts that gave rise to the 2023 Case, where the trial court found the Mother was in substantial compliance with the case plan and determined that reunification with the Mother was in the Child's manifest best interest.

Accordingly, termination under section 39.8063(1)(c) was not supported by clear and convincing evidence.

IV.

We next address whether termination was the least restrictive means of protecting the Child from harm.

It was the Department's burden to prove by clear and convincing evidence that termination of the Mother's parental rights is the least restrictive means. *See R.W.W.*, 788 So. 2d at 1023 ("[T]he Department must prove the allegations supporting the termination of parental rights by clear and convincing evidence and must establish that termination of those rights is the least restrictive means of protecting the child from harm."). The least restrictive means test "requires that measures short of termination should be utilized if such measures can permit the safe re-establishment of the parent-child bond." *Dep't of Child. & Fams. v. B.B.*, 824 So. 2d 1000, 1009 (Fla. 5th DCA 2002).

As discussed above, there was no evidence that could support a finding that the Mother would not benefit from another case plan, or

modification of the prior case, or that offering the Mother further services would be futile. To the contrary, the Mother has previously shown that she is able and willing to comply with case plan tasks and testified at the trial to additional measures that she is taking for her mental health and working on with respect to her relationship with the Grandmother, all for the best interest of the Child. We note that the Final Judgment expressly allows for the Mother and Grandmother to have continued visitation with the Child even after the termination of the Mother's parental rights. The trial court obviously recognized that the evidence established that the Mother and Child have a loving, mutual relationship. We acknowledge that "the least restrictive means test [is not] intended to preserve the parental bonds at the cost of a child's future," *A.J. v. K.A.O.*, 951 So. 2d 30, 33 (Fla. 5th DCA 2007); however, allowing the Mother and Grandmother continued visitation—even after termination— cannot be reconciled with the trial court's finding that the Mother's continued involvement with the Child threatens the life, safety, well-being, or physical, mental, or emotional health of the Child or that terminating the Mother's parental rights is the least restrictive means of protecting the Child from harm. The least restrictive means would be to offer the Mother a case plan. *See M.S. v. Dep't of Child. & Fams.*, 920 So. 2d 847, 851 (Fla. 4th DCA 2006) ("If, as the Department contended at trial, M.S.'s historical instability is due to mental health issues, surely the least restrictive means of protecting A.S. would be to offer M.S. a case plan because she previously almost successfully completed her plan in [a prior case] and apparently complied with all mental health requirements at that time.").

The Department did not establish that the Mother was not amenable to services or that supervised visitation would be harmful to

14

the Child during the time the Mother worked to resolve her problems. We note that this is not a case of egregious abuse or danger to the Child's physical or emotional health.[7]

V.

Because there was not competent substantial evidence to support the trial court's finding that the Mother's continued involvement with the Child would threaten the life, safety, well-being, or physical, mental, or emotional health of the Child irrespective of the provision of services and because the termination of the Mother's parental rights was not the least restrictive means of protecting the Child, we reverse the portion of the Final Judgment that terminates the Mother's parental rights and remand to the trial court with instructions that the Child remain dependent and that the Department offer the Mother an appropriate case plan with a goal of reunification. We note that if the Mother fails to comply with the case plan, the Department may again petition to terminate the Mother's parental rights. *See R.W.W.*, 788 So. 2d at 1025.

Reversed and remanded for further proceedings.

ROTHSTEIN-YOUAKIM, J., Concurs.
KHOUZAM, J., Concurs specially with opinion.

---

[7] Because we conclude that the termination of the Mother's parental rights was not the least restrictive means of protecting the Child we do not comment on the trial court's conclusion that the Department proved as grounds for termination either chronic abuse pursuant to section 39.806(1)(g) or that the Child was out of care for twelve of the last twenty-two months and the Mother failed to substantially complete her case plan pursuant to section 39.806(1)(e)(3). *See C.A.T. v. Dep't of Child. & Fams.*, 10 So. 3d 682 (Fla. 5th DCA 2009) (holding that resolution of whether termination of the father's parental rights was the least restrictive means of protecting the child rendered moot the issue of whether the trial court's finding that the father abandoned the child pursuant to section 39.806(3) was supported by competent substantial evidence).

15

KHOUZAM, Judge, Specially Concurring.

Because the record does not support termination in the particular context of this case, I concur in the decision to reverse and remand the judgment as set forth in the majority opinion.

_____

Opinion subject to revision prior to official publication.